**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Lee Roy MULLINS, Jr., Defendant–Appellant.**

**No. 92–5087.**

United States Court of Appeals, Fourth Circuit.

Argued May 5, 1992.

Decided Aug. 7, 1992.

---

Hunt Lee Charach, Federal Public Defender, Charleston, W.Va. (argued), for defendant-appellant.

Michael Lee Keller, Asst. U.S. Atty., Charleston, W.Va. (argued), (Michael W. Carey, U.S. Atty., Mary S. Feinberg, Asst. U.S. Atty., on brief), for plaintiff-appellee.

Before PHILLIPS, MURNAGHAN, and NIEMEYER, Circuit Judges.

## OPINION

MURNAGHAN, Circuit Judge:

Lee Roy Mullins, Jr. was charged by information with aiding and abetting the commission of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. He pleaded guilty before the United States District Court for the Southern District of West Virginia, and was sentenced to six months of community confinement and ordered to pay restitution in the amount of $42,500. Mullins appeals from the sentence and the order of restitution.

The issues considered here are whether the district court erred in determining the extent of "relevant conduct" attributable to Mullins, *see* United States Sentencing Commission *Guidelines Manual*, § 1B1.3 (Nov. 1991), and whether the order of restitution meets the requirements of the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663 *et seq.* We hold that the separate uncharged fraudulent scheme was not part of the "same course of conduct or common scheme or plan" as the offense of conviction. In addition, we hold that the findings as to the victim's loss were not in compliance with the requirements of the VWPA. Therefore, we vacate the sentence and remand for resentencing, and we vacate the order of restitution and remand for further findings of fact.

## I. BACKGROUND

The offense of conviction is based on Mullins' involvement in a fraudulent scheme conducted by his brother, Paul J. Mullins ("Paul"). In 1987, Paul initiated a scheme to defraud Gary Workman of Modern Equipment Company in Charleston, West Virginia of kitchen equipment. Paul acquired the equipment from Workman by submitting a false credit application that misrepresented his financial resources. The application included a statement that "Marie Keeney" agreed to be jointly liable for the debt. Keeney's signature was forged. Equipment valued at $45,000 was provided to Paul on credit by Workman.

There is no indication that Mullins had any knowledge of the fraud perpetrated on Workman by his brother Paul. Around the time that Paul obtained the equipment from Workman, Mullins moved to the country of Oman.

In the fall of 1988, Paul arranged an amplification of the scheme to forestall Workman from taking action to repossess the equipment. He telephoned his brother in Oman and asked him to tell Workman, in a subsequent phone call to be placed the following day, that Mullins owed money to Paul and that he was mailing a check to Paul in the amount of $35,000 as payment of that debt. The next day, in the presence of Workman, Paul telephoned his brother in Oman and Mullins spoke with Workman as arranged, telling him that he would send the check to Paul in two to three weeks.

Mullins testified at the plea hearing that he made the false statements to Workman so that his brother "could have some breathing room." Mullins maintains that his brother told him he intended to pay Workman eventually, but that he needed his assistance simply to get Workman "off his back" temporarily. In early 1989, some of the equipment was repossessed by Workman and auctioned at public sale. Because Paul had taken measures to prevent repossession, some of the equipment was not recovered.

Having learned the limits on the extent of a duty to be one's brother's keeper, Mullins pleaded guilty to the charge of aiding and abetting the commission of wire fraud, the person defrauded being Workman.

The separate, uncharged fraud determined by the district court for sentencing purposes to be "relevant conduct" under U.S.S.G. § 1B1.3 had arisen from Mullins' involvement in early 1988 with his brother's scheme to defraud several life insurance companies. The life of the same woman whose signature was forged in the credit application submitted to Workman, Marie Keeney, was fraudulently insured by having a younger woman pose as Keeney. The younger woman underwent physical

examinations, purchased insurance from three life insurance companies for amounts totaling $1,100,000 in the name of Keeney, and named Paul as Keeney's beneficiary. Paul asked his brother to transport the woman to the physical examinations, and Mullins did so on three separate occasions, with knowledge as to the fraudulent nature of the plan.

Mullins had been charged in a one-count information with aiding and abetting wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.[1] The information to which he pled guilty charged Mullins with making false statements in a telephone conversation with a businessman "for the purpose of aiding and abetting" a pre-existing "scheme and artifice to defraud" the businessman. That "scheme and artifice to defraud" was described in the information as a scheme perpetrated by a known individual "to obtain [the businessman's] money and property in the approximate amount of $45,000 by means of false and fraudulent pretenses, representations and promises."

In a letter to Mullins' attorney dated July 25, 1990, the same day as the plea agreement, the government set forth the particulars of the Workman case against Mullins. The letter also described the life insurance frauds. Regarding the kitchen equipment, the letter stated that the purpose of Mullins' false statement to Workman was "to convince Mr. Workman that Paul would have money with which to pay Mr. Workman," that the equipment had been "purchased with a note allegedly signed by Marie Keeney," and that Mullins "knew when he made the false statement that he was aiding and abetting Paul in a scheme to defraud Mr. Workman." Regarding the life insurance scheme, the government stated in the letter that Mullins had transported a woman to three physical examinations

at which the woman had falsely represented that she was Marie Keeney, and that Mullins was aware of that fact. No information about the identity of the woman who posed as Keeney was included in the letter.

Pursuant to a grant of use and sentencing immunity in the plea agreement, Mullins informed the government that the woman whom he transported to the physical examinations was named Mildred Irene Hunting. He also stated that he had introduced Hunting to his brother. Upon questioning Hunting, the government learned that she not only posed as Keeney in the insurance scheme, but that she had forged Keeney's signature on papers given to her by Paul, including one that Paul later turned into the fraudulent credit application submitted to Workman.

The government argued that, in sentencing Mullins for his participation in defrauding Workman, the sentence should be based on the dollar value of the intended loss involved in the life insurance fraud as well, because it was "relevant conduct" within the meaning of U.S.S.G. § 1B1.3. A charge had not been made of, and, of course, there was no conviction for, the insurance frauds. Mullins protested that it was not relevant conduct and that any link between the schemes was based on information he had provided pursuant to the grant of immunity. The government claimed that his assistance of knowledge of Hunting's full name and its use of information obtained from Hunting did not violate the grant of immunity because, prior to any discussions with Mullins, investigators knew that the woman who posed as Keeney to obtain the insurance was named "Irene" and that she resided in Lincoln County, West Virginia, even though her

1. 18 U.S.C. § 1343 provides:
   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures,

or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
18 U.S.C. § 2(a) provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

**1142**

full name was not then known to the government.

Relative to the sentence, the presentence report contained the following calculation: (1) a base offense level for fraud of six levels, under U.S.S.G. § 2F1.1(a); (2) a nine-level increase under U.S.S.G. § 2F1.1(b)(1)(J), based on the potential loss of over one million dollars in the uncharged insurance fraud scheme which was relevant conduct in sentencing the kitchen equipment fraud;[2] (3) a two-level increase under U.S.S.G. § 2F1.1(b)(2)(A), for an offense involving more than minimal planning; (4) a three-level decrease for Mullins' minor role in the offense; and (5) a two-level decrease for Mullins' acceptance of responsibility. That amounted, after adding and subtracting, to an offense level of twelve.

At the sentencing hearing on January 13, 1992, Mullins claimed (1) that the uncharged insurance fraud was not related to the offense of conviction; (2) that any evidence linking the two schemes was provided by him pursuant to the provision of immunity in his plea agreement; and (3) that he should not be held accountable for Workman's full financial loss. The district court rejected those objections, but found that the two-level increase for an offense involving more than minimal planning was unjustified. Thus, the offense level was determined to be ten, producing a sentencing range of 6–12 months. The district court sentenced Mullins to six months of community confinement and four and a half years of supervision.

On the issue of restitution, the presentence report stated that Workman's total loss was $42,500, and the government requested the court to order restitution of that amount. Mullins objected on the grounds that (1) the amount included consequential damages (legal fees and investigator fees and other sums expended for repossession of the equipment) that may not properly be included, and (2) his earning capacity was insufficient to enable him to pay that amount. The district court ordered Mullins to pay $42,500.[3]

## II. DISCUSSION

### A. SENTENCE ENHANCEMENT FOR OTHER RELEVANT CONDUCT

■■■ On appeal, Mullins has challenged the district court's determination of "relevant conduct" under U.S.S.G. § 1B1.3(a)(2).[4] He has argued that (1) the district court misinterpreted the scope of § 1B1.3(a)(2), and that as a result the court erred in sentencing him for the full loss resulting from the scheme to defraud Workman and for the intended losses in the life insurance scheme; and (2) the use of information he provided pursuant to the grant of use and sentencing immunity in

2. The offense claimed concerning the life insurance was committed at a time when the Sentencing Guidelines were more favorable to Mullins, so the presentence report utilized the earlier version. Effective November 1, 1989, a loss involving the $1,142,500 would result in an increase of eleven levels instead of nine.

3. As it turns out, the brother, Paul, was convicted of two counts of mail fraud and sentenced to 37 months. However, he was not convicted of the fraud involving Workman, and so restitution to Workman from Paul was not ordered.

4. U.S.S.G. § 1B1.3(a), entitled "Relevant Conduct (Factors that Determine the Guideline Range)," provides, in part:

(a) Chapters Two (Offense Conduct) and Three (Adjustments). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics, (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1) all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense;

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3) all harm that resulted from the acts or omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts or omissions; and

(4) any other information specified in the applicable guideline.

the plea agreement was improperly used to establish the nexus between the Workman fraud and the life insurance fraud for purposes of establishing that the latter was relevant conduct. It was not improper to sentence Mullins on the basis of the full loss resulting from the scheme to defraud Workman, without applying the analysis of "relevant conduct" under U.S.S.G. § 1B1.3.[5] We are, however, troubled by the court's finding that the life insurance scheme was "relevant conduct" within the meaning of U.S.S.G. § 1B1.3.

■ The parties disagree as to whether the district court's finding is a factual determination which we review only for clear error, or whether we should review *de novo* the court's adoption of an "expansive view" of U.S.S.G. § 1B1.3(a)(2) as a matter of legal interpretation. *See United States v. Daughtrey*, 874 F.2d 213, 217–18 (4th Cir.1989). It is clear that the district court did not merely make a factual determination, but endeavored to interpret the scope of the guideline, concluding that "the very broadest definition of relevant conduct" would be adopted by the Fourth Circuit. We find that the district court was not incorrect in adopting a broad approach. We do not contradict the use of a broad approach. However, the court's application of the scope of that broad approach was clearly erroneous. The application approaches a rule that knowing a brother to be a crook makes any conduct assisting the brother in carrying out an uncharged offense "relevant conduct."

The "relevant conduct" provision in § 1B1.3(a)(2) is applicable only to the kinds of offenses that would be grouped together under § 3D1.2(d), and is designed to take account of "a pattern of misconduct that cannot readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing." U.S.S.G. § 1B1.3, comment. (backg'd). Offenses are grouped together under § 3D1.2(d), *inter alia*, "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss," as is the case with fraud. U.S.S.G. § 3D1.2(d). As a specific offense characteristic for the offense of fraud, the Sentencing Guidelines require a determination as to the dollar value of the loss, including both the actual loss and intended loss. U.S.S.G. § 2F1.1(b)(1); *id.*, comment. (n. 7). Conviction for the commission of other fraudulent activity would require grouping the convictions together and determining the offense level based upon the total dollar loss. U.S.S.G. § 3D1.2(d). In sentencing Mullins on the one count for aiding and abetting the Workman fraud, the Guidelines required the court to include the loss attributable to "all acts and omissions committed or aided and abetted" by him, or for which he "would be otherwise accountable," U.S.S.G. § 1B1.3(a)(2); *id.*, comment. (n. 2), and that would be grouped together under § 3D1.2(d) if there were multiple counts of conviction, if they are "part of the same course of conduct or common scheme or plan as the offense of conviction," U.S.S.G. § 1B1.3(a)(2), even if such other conduct "is not formally charged or is not an element of the offense

---

5. Mullins' attempt to separate the fraud perpetrated against Workman into a prior uncharged "kitchen equipment fraud" committed by Paul, in which he did not participate, and a later charged "wire offense fraud," in which he did participate, is unconvincing. Although, in response to challenges to application of the Guidelines, the district court stated that the "offense of conviction ... is aiding and abetting the international phone call that resulted in a wire fraud," calculating Mullins' sentence on the basis of Workman's full loss was not premised on a finding that the earlier "kitchen equipment fraud" was uncharged conduct that was relevant to sentencing the "wire offense fraud."

The plea agreement expressly stated that Mullins was pleading guilty to the violation of 18

U.S.C. §§ 1343 and 2 "as charged in said information." The information stated that a known individual was engaged in a scheme to defraud a businessman "by false and fraudulent pretenses, representations and promises," and charged Mullins with aiding and abetting *that* scheme to defraud by means of wire communication. The "earlier" fraud engaged in by Paul simply cannot be termed "uncharged criminal conduct," since it is criminal conduct *charged* in the information. Mullins pleaded guilty to it. Paul was the principal, and Mullins, although he may have assisted the scheme only after earlier fraudulent misrepresentations had been made, pleaded guilty to aiding and abetting the entire scheme to acquire Workman's property through fraud.

of conviction," U.S.S.G. § 1B1.3, comment. (backg'd). The issue, then, is whether the life insurance fraud was "part of the same course of conduct or common scheme or plan as the offense of conviction," the Workman fraud, within the meaning of § 1B1.3(a)(2), such that Mullins' sentence must also be based upon the dollar value of intended losses in the insurance fraud, *i.e.,* $1,100,000, or only upon the dollar value of the loss involved in defrauding Workman.

■ In assessing conduct for purposes of § 1B1.3(a)(2), "the sentencing court is to consider such factors as the nature of the defendant's acts, his role, and the number and frequency of repetitions of those acts, in determining whether they indicate a behavior pattern." *United States v. Santiago,* 906 F.2d 867, 872 (2d Cir.1990). The significant elements to be evaluated are similarity, regularity and temporal proximity between the offense of conviction and the uncharged conduct. *United States v. Hahn,* 960 F.2d 903 (9th Cir.1992). Although an appellate court "cannot formulate precise recipes or ratios in which these components must exist in order to find

conduct relevant," a district court should "look for a stronger presence" of at least one of the components if one of the components is not present at all. *Hahn,* 960 F.2d at 910. If the uncharged conduct is both solitary and temporally remote, then there must be "a strong showing of substantial similarity." *Id.*

Regularity and temporal proximity are extremely weak here, if present at all, as the uncharged conduct took place over six months prior to the two phone calls underlying the offense of conviction. Thus, we are left to consider similarity, and that is essentially the basis upon which the district court found the insurance fraud to be relevant conduct.[6] Conduct on the part of Mullins that the district court identified as similar in both schemes was that Mullins "gave his proxy" to his brother, to aid his brother's commission of fraud when asked to do so. Another "connection" between the schemes identified by the court was the involvement of Hunting, Mullins and Paul in both schemes.

The "connection" based on Hunting's involvement in both fraudulent schemes is

---

**6.** The district court discussed its application of the "relevant conduct" analysis as follows:

[Y]ou approach this issue of scope of fraudulent conduct from a variety of perspectives and you don't look at it just from the particular charged offense. You look at it with the connections of the various people.

Now, with the ... [July 25, 1990] statement of the United States Attorney's Office, it appears that though Ms. Hunting is not identified by name, she certainly is identified as the female who did thus and such and the person who was actively recruited by Mr. Paul or Mr. Lee Roy Mullins to do Paul Mullins' bidding in certain fraudulent schemes.

Mr. Lee Roy Mullins by his conduct, both with the phone call and with his recruitment activities also gave his proxy to his brother, the admitted ring leader and the person who devised these various schemes, gave proxy to commit fraud kind of where and when it might be successful.

I don't think that this Court is required to make any quantum leap in attributing Mr. Lee Roy Mullins' recruiting activities relating to the one million one hundred thousand dollar insurance fraud to be a part of the relevant conduct, fraudulent conduct here involving Mr. Lee Roy Mullins in this fraudulent scheme to defer, to avoid collection efforts by Mr. Gary Workman on what might have been an original fraud—in other words buying, ac-

quiring equipment under false pretenses. But Mr. Lee Roy Mullins in his part was to hold off that creditor, not as defense counsel would assume, not to hold off until the creditor could be paid, but rather to hold them off so the creditor wouldn't be paid, just one more instance of fraud.

And I think that considering Mr. Paul Mullins' activities and Mr. Lee Roy Mullins' complicity in those activities, it is to be—it's a reasonable conclusion to think that he—that any time his brother called upon him for cooperation in a fraudulent or in a scheme that it was likely to be fraudulent. And, you know, he knew that some harm would come from this or that his brother and those participating in the fraudulent scheme would either acquire money or acquire property by their activities. So I do consider it a part of the relevant conduct, and I think that there is enough connection here with Ms. Hunting, whether identified as such in July of 1990 or identified as a female recruited to do certain things, there is enough connection between her, Mr. Lee Roy Mullins, and Mr. Paul Mullins in all these schemes to make them interconnected and to make all the conduct relevant to the charged offense here, and I think it's fair under the expansive interpretation to charge Mr. Lee Roy Mullins for the additional very large monetary conduct of one point one million dollars.

contested by Mullins on the ground that establishment of the nexus relies upon information he provided pursuant to the grant of use and sentencing immunity. Although the court sought to avoid relying on the information provided by Mullins by stating that there was enough of a connection between Hunting, Mullins and Paul whether or not Hunting was specifically identified, that overlooks one point—the fact that Hunting was involved in any way in the Workman equipment fraud was not known until investigators questioned Hunting after Mullins revealed her identity. However, we need not decide whether the court was entitled to use the information based on the government's assertion that the investigators already knew enough to locate Hunting on their own. Even if that information could be used, we still do not find the insurance fraud to be part of the "same course of conduct or common scheme or plan" as the Workman equipment fraud.

The fact that the same three individuals were involved in two schemes in which Hunting masqueraded as Keeney does not, in and of itself, make them sufficiently similar as to be part of the "same course of conduct or common scheme or plan." There must be some consideration of the relative significance to the overall scheme of a particular similarity that is identified. *See Hahn,* 960 F.2d at 911 (requiring a "strong showing of substantial similarity" if the conduct is neither regular nor temporally related). The fact that Keeney's name was used in both schemes by the same woman is not sufficiently significant to either fraudulent scheme as to create a "substantial similarity," as is apparent from a description of each course of conduct. The offense of conviction centered on false statements made by Mullins by wire communication to a seller to delay repossession of property that had been provided to Paul on the basis of a fraudulent credit application. The uncharged offense conduct involved Mullins' assisting a younger woman to pose as an older woman to obtain life insurance and name Paul as the beneficiary. The use of the name Keeney by Hunting is not a particularly signifi-

cant element of either scheme, such as would create a "substantial similarity" enabling us to find that the two are part of the "same course of conduct or common scheme or plan."

The other "connection" found, *i.e.,* Mullins' willingness to aid his brother's fraudulent endeavors, relies upon an unduly broad description of that similar feature to reach the conclusion that the two quite independent schemes were both part of the "same course of conduct or common scheme or plan." It is not sufficient that other crimes are "of the same kind" as the charged offense if they are not part of the same course of conduct or plan. *U.S. v. Wood,* 924 F.2d 399, 404 (1st Cir.1991) (quoting *United States v. White,* 888 F.2d 490, 500 (7th Cir.1989)). To state that the pattern of Mullins' conduct was that of assisting his brother in committing various frauds when asked to do so, as did the district court, is to describe his conduct at such a level of generality as to eviscerate the evaluation of whether uncharged criminal activity is part of the "same course of conduct or common scheme or plan" as the offense of conviction. With a brushstroke that broad, almost any uncharged criminal activity can be painted as similar in at least one respect to the charged criminal conduct. "The goal of the provision ... is for the sentence to reflect accurately the seriousness of the crime charged, but not to impose a penalty for the charged crime based on unrelated criminal activity." *Id.*

Moreover, while neither "connection" identified by the district court indicates a substantial similarity, the distinctions between the uncharged frauds and the offense of conviction are indeed quite significant. Those distinctions include the kind of property to be obtained and the method of doing so, the type of victim to be defrauded, the general *modus operandi* of the criminal activity, and the actual conduct engaged in by the defendant.

We conclude, therefore, that the uncharged conduct involved in the life insurance fraud was not sufficiently similar, regular, or temporally related as to be "part of the same course of conduct or

common scheme or plan" as the offense of conviction. The offense level and sentencing range should not have been based on the intended losses attributable to the uncharged insurance fraud. We vacate the sentence and remand to the district court for resentencing. We do note, however, that even though Mullins' participation in the life insurance fraud is not "relevant conduct" that should be used to calculate his offense level and sentencing range, the conduct may be considered by the court in determining which sentence to impose within the designated sentencing range. *See* U.S.S.G. § 1B1.3 comment.

## B. RESTITUTION AWARD

■ We turn to the contention that the selection of $42,500 as the amount of the restitution award was erroneous. The basis for selecting that amount may be found in the following paragraph in the presentencing report:

> Gary Workman, owner of Modern Equipment Company, indicates that as the result of his telephone conversation with the defendant, he delayed repossessing $45,000.00 worth of kitchen equipment which he had sold to Paul Mullins. In the meantime, Paul Mullins disposed of some of the equipment and when Workman finally repossessed it, most of it had to be sold at auction. Mr. Workman also indicates that he had a great deal of legal expenses involved in repossessing the equipment and liquidating it. Workman indicates his total loss to date as a result of not repossessing the equipment when he had the opportunity is $42,500.00.

The district court made no findings regarding the amount of the award, but merely stated that the award would be $42,500, "the amount defrauded plus the consequential loss." The record on appeal suggests that the amount includes (1) legal fees incurred to repossess the equipment; (2) investigator's fees expended to track down the equipment hidden by Paul; (3) devaluation of the market price of the recovered equipment; and (4) loss of some of the equipment hidden by Paul. Mullins has challenged the inclusion of consequential damages in the restitution award and the failure of the court to make findings as to his ability to pay.[7]

■ The amount of restitution that may be awarded under the VWPA is specifically described:

> The order may require that such defendant—
>
> "(1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense—
>
> (A) return the property to the owner of the property or someone designated by the owner; or
>
> (B) if return of the property under subparagraph (A) is impossible, impractical, or inadequate, pay an amount equal to the greater of—
>
> (i) the value of the property on the date of the damage, loss, or destruction, or
>
> (ii) the value of the property on the date of sentencing,
>
> less the value (as of the date the property is returned) of any part of the property that is returned[.]"

18 U.S.C. § 3663(b). An order of restitution under the VWPA must conform to the specific type and amount of award that is

---

7. Mullins also has argued that the court improperly concluded that he could be held responsible for all of the losses attributed to the scheme to defraud Workman. That claim is based on the Supreme Court's holding that the amount of restitution under the VWPA may only be based on "the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413, 110 S.Ct. 1979, 1981, 109 L.Ed.2d 408 (1990). Mullins has contended that the specific conduct that is the basis of his offense of conviction is only the wire fraud in which he said he would send a check within a couple of weeks, and that, there-fore, the loss he caused is only that which can be attributed to the two to three week delay in repossession.

That argument is resolved by our conclusion that, based on the plea agreement and the information, we must view the offense of conviction as the aiding and abetting of the entire scheme to defraud Workman, not merely a fraudulent scheme to secure a delay in repossession. *See supra* n. 5. Therefore, the amount of restitution may be based on the losses suffered by Workman from the scheme to defraud him of the equipment.

authorized by the plain language of the statute. *United States v. Sharp*, 927 F.2d 170, 174 (4th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 139, 116 L.Ed.2d 106 (1991) (holding that restitution for lost income in property cases was improper under the plain language of the statute, because restitution for lost income is authorized only for victims of bodily injury). The plain language of the statute is to be given effect, even if costs that are not included would appear to be justified as a way of making the victim whole. *United States v. Mitchell*, 876 F.2d 1178, 1184 (5th Cir.1989) (holding that restitution for lost income is not authorized for offenses resulting in damage to, loss of, or destruction of property; "the fact that the goals of the [VWPA] may be thwarted by denying lost income restitution does not authorize us to ignore the plain language of the statute"). In cases involving the damage, loss, or destruction of property, restitution must be limited to that which the statute authorizes: return of the property, or payment of the property's value, either on the date of damage or loss or on the date of sentencing, less the value of any part of the property that is returned.

No findings were made as to the value of the equipment either on the date of loss or on the date of sentencing. The only information in the record as to the value of the equipment is the paragraph in the presentence report stating that Workman said the equipment was valued at $45,000, but that when he repossessed some of it, most had to be sold at auction. Moreover, there is no evidence whatsoever in the record as to the value of the property returned, or as to which date was used in determining the value of the property lost.

■ The government is required to prove the proper amount by a preponderance of the evidence if the amount is disputed. 18 U.S.C. § 3664(d). An award of restitution under the VWPA must be based on findings as to the value of the property as of the date of loss or the date of sentencing, and as to the value of any part of the property that is returned, as of the date of return. Even if it is difficult to measure

those values, nonetheless, that is what the statute requires. *United States v. Angelica*, 859 F.2d 1390, 1394 (9th Cir.1988) (VWPA "unambiguously" requires valuation of the property at the time of loss or sentencing, even if that "present[s] a difficult determination for the district court"). We therefore remand for findings of fact to support an order of restitution.

■ The government urges us to uphold the inclusion of consequential damages on the grounds that the value of the property fraudulently obtained from Workman was $45,000, and that, since the full amount would be recoverable if Workman had not undertaken self-help measures (such as civil repossession), the lesser amount of $42,-500 should be recoverable even if it includes amounts expended in such self-help. The argument rests on infirm foundations. First, the argument assumes that the full amount of $45,000 was recoverable. Even if that amount were found to be the value of the property on either the date of loss or sentencing, the value of the portion of the property recovered by Workman must be determined and deducted from that amount. More importantly, we disagree with the thrust of the government's argument, namely, that any sums Workman expended to recover the property are recoverable as long as the total is less than the value of the property when Paul first acquired it. That is not in keeping with the plain language of the statute. We hold that an award of restitution under the VWPA cannot include consequential damages such as attorney's and investigators' fees expended to recover the property. *See United States v. Arvanitis*, 902 F.2d 489, 497 (7th Cir.1990) (holding that restitution for consequential damages, such as legal fees expended to investigate a fraudulent insurance claim, are unavailable under the VWPA); *United States v. Barany*, 884 F.2d 1255, 1261 (9th Cir.1989), *cert. denied*, 493 U.S. 1034, 110 S.Ct. 755, 107 L.Ed.2d 771 (1990) (holding that attorneys' fees and costs spent by an insurance company to defend against civil suit filed by defendant are not recoverable under the VWPA); *Mitchell*, 876 F.2d at 1184 (hold-

ing that restitution of attorneys' costs expended to recover from an insurance company are not authorized by the VWPA).[8]

The government also has argued that we should allow the consequential damages incurred for the recovery and liquidation of the equipment based on an analogy to our allowing the recovery of repair costs for damaged property in *United States v. Sharp*, 927 F.2d at 174 (upholding award of costs for repair of a damaged mine). Because *Sharp* involved repair costs for damage to real property, as a way of providing restitution in an amount equal to the value of the property on the date of damage, it is not analogous to expenses involved in recovering chattel property. *See also Mitchell*, 876 F.2d at 1183 (costs of repairing property that was returned to victim are not allowed under the statute).

■ The VWPA requires the district court to consider specific factors, including the financial earning ability of the defendant. 18 U.S.C. § 3664(a). We have held that explicit findings as to the factors set forth in § 3664(a) must be made on the record. *United States v. Bruchey*, 810 F.2d 456, 458 (4th Cir.1987). *Accord United States v. Hill*, 798 F.2d 402, 406–07 (10th Cir.1986); *United States v. Palma*, 760 F.2d 475, 480 (3rd Cir.1985). The trial court must "make clear findings of fact on the defendant's resources, and the financial needs and earning ability of the defendant ... [that are] keyed to the specific type and amount of restitution ordered." *Bruchey*, 810 F.2d at 458. The court failed to make any such findings as to Mullins' ability to pay, and should do so on remand.

Accordingly, the order of restitution is vacated and we remand for findings of fact in accordance with the statute and our opinion. The case is, as to sentencing, re-

manded for resentencing in accordance with the foregoing opinion.

**VACATED AND REMANDED.**

---

8. The government characterizes these cases excluding consequential damages as based on a concern to avoid excessive recovery or recovery for costs that are too remote from the offense of conviction, and then argues that such concerns are not implicated here. However, both the Fifth Circuit in *Mitchell* and the Seventh Circuit in *Arvanitis* display a concern with giving effect to the plain meaning of the statute, without examination of whether recovery is excessive or whether the costs are too remote. The Ninth Circuit in *Barany* does note that the attorneys' fees are "too remote" to the offense of conviction.