[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 97-8613

_____

D. C. Docket No. 2:96-CR-019-01-WCO

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CLAUDE A. BLANC, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(July 14, 1998)**

Before DUBINA and MARCUS, Circuit Judges, and PROPST*, Senior District Judge.

_____
*Honorable Robert B. Propst, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

MARCUS, Circuit Judge:

Defendant-appellant Claude Blanc appeals the sentence imposed by the district court in this criminal fraud case. Blanc claims that the district court erred in concluding that a fraud charged in an earlier case for which Blanc is currently incarcerated did not constitute relevant conduct under section 5G1.3 of the Sentencing Guidelines for purposes of sentencing Blanc in the instant case. Consequently, Blanc argues, his sixty-month sentence in this case should have been imposed to run concurrently with, rather than consecutively to, the federal prison sentence imposed in the earlier fraud case, and we should vacate the sentence and remand with instructions to sentence defendant to a term concurrent with the undischarged portion of the sentence he is currently serving. Because we conclude that the fraud charges in each case related to discrete, separate, and wholly identifiable crimes, the district court properly found that the earlier fraud was not relevant conduct under section 5G1.3 of the Sentencing Guidelines, and we reject Blanc's claim and affirm the district court.

I.

Although the record reflects that Blanc has engaged in numerous fraudulent schemes, this appeal is concerned with only two: National Nurseries, Incorporated ("NNI"), the instant case, and Crystal Clear Corporation ("CCC"), a previous fraud. A detailed explication of these distinct frauds is necessary to our analysis.

A.    Crystal Clear Corporation

In the earlier scheme, the bulk of which occurred in 1989, Blanc, along with co-conspirators James Plagman and Donald Ingram, solicited investors through newspaper advertisements and toll-free telephone numbers to purchase and install bottled-water-vending

machines. They told potential investors that CCC had hundreds of contracts, including one with 7-Eleven stores, to install and maintain water machines. Blanc and his co-conspirators promised investors that they would receive their choice of either a guaranteed monthly amount or a percentage of the profits. CCC did not install or operate the vending machines, but provided investors with false documentation and sometimes with "lulling checks" to give them a false sense of security. Other than these "lulling checks," CCC did not pay the investors any return. The United States charged Blanc for his conduct in the CCC scheme in 1994 in the Northern District of Georgia ("CCC Case"), and on August 9, 1995, Blanc entered into a negotiated plea of guilty to one count of conspiracy to commit wire and mail fraud. Although the Sentencing Guidelines suggested a significantly longer sentence, Blanc was sentenced to the statutory maximum of sixty months in prison. The record in the case under review suggests that the district court in the CCC Case did not consider Blanc's conduct in the NNI scheme when it sentenced him to sixty months in jail. Indeed, the government was still investigating the facts relating to the NNI scheme when the district court in the CCC Case sentenced Blanc in that matter.

B.     National Nurseries, Incorporated

Between 1993 and 1994, Blanc participated in the NNI fraud which gives rise to the instant appeal. NNI, which was incorporated on July 6, 1993, and engaged in the business of marketing and selling greenhouse opportunities, advertised in newspapers throughout South Carolina, North Carolina, Florida and Georgia. The advertisements read substantially as follows:

**GREENHOUSE FOR FUN AND PROFIT**

> Grow house plans for major accounts such as Home Depot, K-Mart, Roses, etc. You need a minimum 12' x 16' yard for custom designed state of the art Greenhouse. Everything from delivery, installation and services of a certified horticulturist included. You don't need a "green thumb" but must be able to follow instructions. You need approximately 2 hours per day to care for the plants. POTENTIAL $1,800 to $5,300 PER MONTH by contract with wholesale buyer. You need $16,800 to $28,000 to start. **800-362-7299.**

Potential investors who called the 800 number listed in the advertisement were told that the company was National Nurseries, Incorporated.

NNI scheduled appointments for the potential investors with various salesmen. Ultimately, the investors met Blanc and co-defendant James Robertson. Robertson represented himself as the president and an owner of NNI, and Blanc portrayed himself as an independent grower, telling investors that he had recouped his investment within seven months of purchasing his first greenhouse and was planning to buy a second greenhouse. During these meetings, Blanc and Robertson reaffirmed the representations of the advertisements, claiming that the business had accounts with the specified department stores. Additionally, Blanc and Robertson told potential investors that they had sold greenhouses to other investors who had already become successful growers making a lot of money.

The potential investors also received a tour by Robertson, which included viewing operating greenhouses, meeting with Blanc (introduced as "Mr. B"), and taking a trip to meet with Tommy Stowers of Amicalola Florist and Landscaping, who represented himself to be one of the buyers of the plants, with a greenhouse to tour. Stowers later attested that

– 4 –

Robertson and Blanc had offered him $1,000 commission for greenhouses sold to the tour groups that visited his place of business. Stowers also explained that Robertson and Blanc had represented that they would actually give Stowers the money to pay for the plants if Stowers would simply tell the people that he was the buyer of the plants.

With the cost averaging $28,000, the investors purchased greenhouse business opportunities from NNI and signed grower/buyer agreements with Amicalola Landscaping. NNI subsequently built the greenhouses, which were purported to be "state of the art." In reality, however, the design of the greenhouses did not provide adequate light, space, and ventilation to grow the number of plants necessary to generate $1,800 per month.

NNI provided the investors with plugs and planting soils and assisted them in setting up the greenhouses. After the growing cycle was completed and the plants were ready, the investors contacted NNI to pick up the plants. Amicalola Florist and Landscaping, which held the grower/buyer contract, filed for bankruptcy in December 1993 and went out of business, leaving the contracts for buying the plants void. At that time, Blanc started C & S Landscaping, Incorporated, which represented itself to be a wholesale buyer of plants grown by investors who had purchased greenhouses from NNI. C & S purchased only very few plants before Blanc began telling investors that he had to divert resources from C & S to defend against legal procedures taken by the Attorney General of Georgia and therefore had to cease operating C & S. The funds used to create C & S and to purchase the limited number of plants that were actually picked up were transferred to C & S from the NNI bank account.

To facilitate the commission of the NNI fraud, Blanc and Robertson employed the United States mail and interstate telephone calls between Georgia and North Carolina, South Carolina, and Florida. The entire conspiracy involved eighty-four victims who invested a total of $1,865,267.

Blanc and the others were indicted in the Northern District of Georgia in an eighty-four-count indictment. Count one of the indictment charged Blanc with conspiracy in violation of 18 U.S.C. §371. The remaining counts charged Blanc with wire fraud, mail fraud, money laundering, perjury, and contempt. Blanc pled guilty to count one. Among other aspects of the plea agreement, it provided as follows:

> The government agrees to take no position regarding the defendant's request that the sentence in the instant case be run concurrently with the remainder of the unexpired term of imprisonment imposed upon defendant in <u>United States of America v. Claude Blanc</u>, Case No. 1:94-CR-383-01 on November 28, 1995, pursuant to U.S.S.G. 5G1.3(c) and commentary.

> The government stipulates that it was aware of and had an open investigation on defendant Claude Blanc for his involvement in the criminal activities of National Nurseries, Inc. at the time of defendant's prosecution and sentencing in <u>United States of America v. Claude Blanc</u>, Case No. 1:94-CR-383-01 and that it may have been possible to consolidate both the instant offense and Case No. 1:94-CR-383-01 for prosecution and sentencing.

The Sentencing Guidelines defined Blanc's offense level as 35, his criminal history category as III, and his sentencing range as 97-121 months. In determining Blanc's sentence, the district court rejected Blanc's argument that the CCC scheme constituted "relevant

conduct" under section 5G1.3 of the Sentencing Guidelines for purposes of sentencing in the instant case and sentenced Blanc on the NNI conduct to the statutory maximum period of incarceration of sixty months to run <u>consecutively</u> to the term of imprisonment imposed in the CCC Case.

II.

We review the sentencing court's findings of fact for clear error and review the application of the Sentencing Guidelines to the facts <u>de</u> <u>novo</u>. <u>United States v. Exarhos</u>, 135 F.3d 723, 729-30 (11th Cir. 1998) (citing <u>United States v. Williams</u>, 51 F.3d 1004, 1011 (11th Cir.), <u>cert.</u> <u>denied</u>, 516 U.S. 900 (1995)).  Therefore, the district court's factual findings regarding whether the two convictions at issue in this sentencing involved the same course of conduct or were part of a common scheme or plan, thus requiring that they be considered together as "relevant conduct," will be reversed only if the determination is clearly erroneous. <u>United States v. Maxwell</u>, 34 F.3d 1006, 1011 (11th Cir. 1994).

The gravamen of Blanc's claim is that the Sentencing Guidelines required the district court to sentence him for the NNI scheme to a term of prison to run <u>concurrently</u> with the prison term to which he was sentenced in the earlier CCC matter.  In support of this contention, Blanc first directs the Court to section 5G1.3 of the Sentencing Guidelines, which, in relevant part, provides as follows:

> (a)    If the instant offense was committed while the defendant was serving a term of imprisonment (including work release, furlough, or escape status) or after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall

be imposed to run consecutively to the undischarged term of imprisonment.

(b)     If subsection (a) does not apply, and the undischarged term of imprisonment resulted from offense(s) that have been fully taken into account in the determination of the offense level for the instant offense, the sentence for the instant offense shall be imposed to run concurrently to the undischarged term of imprisonment.

(c)     (Policy Statement) In any other case, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

U.S. Sentencing Guidelines Manual §5G1.3.

The parties agree that subsection (a) does not pertain to this case. They quarrel, however, over whether subsection (b) or (c) applies here. Blanc contends that subsection (b) applies. Specifically, he claims that the district court was required to consider Blanc's conduct in the CCC Case in determining the appropriate offense level in the instant case because, according to Blanc, his CCC activities constituted "relevant conduct" that was required to be "fully taken into account" in the case under review. Because the district court was required to take Blanc's CCC activities fully into account when determining Blanc's offense level, Blanc argues, the sentence Blanc received in the instant case must run concurrently with the sentence he received in the CCC case.

This Court has previously held that in determining what conduct must be "fully taken into account" for purposes of performing the section 5G1.3(b) analysis, we must decide what criminal activity section 1B1.3 treats as "relevant conduct." United States v. Fuentes, 107

– 8 –

F.3d 1515, 1521-22 (11th Cir. 1997).  Activity that meets the definition of "relevant conduct" under section 1B1.3 must be "fully taken into account" when determining whether section 5G1.3(b) applies, regardless of whether the district court actually considered the activity when it calculated the base level.  Id.

Section 1B1.3(a), in turn, defines four categories of "relevant conduct," only one of which Blanc claims applies here.  Specifically, Blanc notes that section 1B1.3(a)(2) deems all acts and omissions "that were part of the same course of conduct or similar common scheme or plan as the offense of conviction" to be "relevant conduct."  Offenses form the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."  U.S. Sentencing Guidelines Manual §1B1.3, cmt. (n.9(b)).  Where one of these factors is absent, "a stronger presence of at least one of the other factors is required."  Id.  Similarly, offenses qualify as a common scheme or plan if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi."  U.S. Sentencing Guidelines Manual §1B1.3, Application Note 9(A).  In determining whether two or more offenses meet these tests, the sentencing court should consider "'the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses.'" Fuentes, 107 F.3d at 1525 (quoting U.S. Sentencing Guidelines Manual §1B1.3, cmt. (n.9(b)) & citing Maxwell, 34 F.3d at 1011).

As this Court has previously held, section 1B1.3 "is designed to take account of a 'pattern of misconduct that cannot readily be broken into discrete identifiable units that are meaningful for purposes of sentencing.' Thus, 'when illegal conduct does exist in "discrete, identifiable units" apart from the offense of conviction, the Guidelines anticipate a separate charge for such conduct.'" Maxwell, 34 F.3d at 1010-11 (quoting U.S. Sentencing Guidelines Manual §1B1.3, cmt. (backg'd) & citing United States v. Hahn, 960 F.2d 903, 909 (9th Cir. 1992), United States v. Sykes, 7 F.3d 1331, 1335 (7th Cir. 1993), & United States v. Mullins, 971 F.2d 1138, 1143 (4th Cir. 1992)).

Blanc argues that application of these principles to the facts before the Court demands a finding that the CCC activity constituted "relevant conduct" in sentencing in the instant case, and thus, the district court was required to take the CCC conduct fully into account and to sentence Blanc to concurrent prison terms. He contends that this case is materially indistinguishable from Fuentes. We disagree. In Fuentes, the defendant pled guilty to conspiring to run a "chop shop" operation. Basically, he stole Porsches, took them to several locations, removed many of their parts, altered or removed the vehicle identification numbers, and resold the parts to customers throughout the country. Before the federal prosecution, Fuentes had been convicted in state court for some of this activity, and at the time of his conviction in the district court, he was serving two concurrent state sentences. With respect to the acts charged in state court, Fuentes took the Porsches to a shed or to his friend's house to disassemble ("chop") them. As for the federal case, Fuentes took the Porsches to a warehouse to chop them. In providing the probation officer with information

for the pre-sentencing report, the government did not include information relating to any of the activity underlying the state charges. As a result, the district court did not consider the state-convicted crimes in determining the sentence, and the district court imposed the federal sentence to run consecutively to the state sentence. Fuentes appealed, claiming that the district court was required to take the state-convicted activities into consideration when "fully . . . account[ing]" for the offense level, and thus, the district court was required to make the federal sentence run concurrently with the state sentence.

This Court agreed. Among other conclusions, we found that the state and federal Porsche-chopping formed an ongoing series of offenses and qualified as the same course of conduct. Id. Both the state and federal offenses were "very similar, if not identical." Id. at 1525. They were committed with "clear regularity and within a very close time period." Id. Additionally, the Court concluded that the offenses were part of a common scheme because they shared the same purpose and a common modus operandi. Id. Specifically, we concluded that the shared purpose was to "mak[e] money by selling stolen Porsche parts to co-conspirators and bona fide purchasers." Id. Although the Court noted that the offenses involved different Porsches, different victims, and different chop shop locations, we nonetheless found that the differences between the offenses were "dwarfed by the similarities." Id. at 1526.

We find the case at hand entirely distinguishable from Fuentes. Unlike the conduct at issue in the current case, Fuentes's Porsche-chopping activity could not be reduced to smaller, identifiable, discrete units of criminal conduct. Indeed, it is simply not possible to

dissect the stealing and chopping of Porsches occurring over the same period into meaningful, entirely separate and distinct subparts for purposes of determining "relevant conduct" when sentencing. In other words, the conduct at issue in Fuentes was basically fungible; one incident of Fuentes's Porsche stealing and chopping was more or less identical to any other occurrence. Indeed, one who did not know the various victims, times, and locations of each of the incidents would have no way of distinguishing one incident of Porsche theft and chopping from any other in which Fuentes engaged during the relevant time period.

The conduct at issue in the instant case, however, is more akin to that under review in Maxwell, 34 F.3d 1006, most notably because the conduct is subject to meaningful subdivision into wholly discrete and identifiable units.[1] In Maxwell, the defendant had been involved in a conspiracy from the middle of 1986 through June 1991 to distribute and to possess with intent to distribute dilaudid. On one occasion in 1987, Lundy, a distributor who was also involved in the conspiracy, sought to purchase dilaudid from Maxwell. Because Maxwell had no dilaudid, he sold Lundy less than an ounce of cocaine instead. This was the only occasion on which Lundy purchased cocaine from Maxwell. Maxwell never asked Lundy to become involved in cocaine distribution. The government also presented extrinsic evidence regarding other drug dealings in which Maxwell had allegedly been involved.

_____

[1]Because the Court decided Maxwell before note 9 of the commentary to section 1B1.3 was added, the Court evaluated the "similarity, regularity, and temporal proximity" between the offenses. Id. at 1011. This fact, however, does not make the Maxwell analysis any less applicable because these factors remain relevant considerations in the "relevant conduct" analysis.

Among other evidence, the government offered the testimony of Dycus, who testified that, beginning in April of 1986, he had sold cocaine for Maxwell for a period of a month-and-a-half to two months. According to Dycus, he had never discussed dilaudid with Maxwell and had never had any dealings with those involved in the dilaudid distribution. Additionally, the 1986 cocaine deals had occurred solely between Maxwell and him. In calculating Maxwell's offense level, the district court considered the cocaine-selling scheme in addition to the dilaudid conspiracy.

Finding that the cocaine-selling scheme did not constitute "relevant conduct" in considering the scope of the dilaudid conspiracy under section 1B1.3, we held that the district court erred. In reaching this conclusion, we found that the single cocaine sale to Lundy was "directly related to the dilaudid distribution, as Lundy purchased the cocaine as a substitute for dilaudid. Thus, Maxwell's counts of conviction involve[d] a dilaudid distribution scheme." Id. at 1011. Furthermore, we found, "Other than Maxwell, the dilaudid distribution scheme and the cocaine distribution scheme did not involve any of the same parties." Id. We continued, noting that Dycus's sale of cocaine for Maxwell occurred more than a year before Maxwell's single sale of cocaine to Lundy, so the acts were "temporally remote." Id. Finding that there were no "'distinctive similarities'" between the cocaine and dilaudid distribution schemes that "'signal that they are part of a single course of conduct,'" we held that the offenses were "'isolated, unrelated events that happen only to be similar in kind.'" Id. (citation omitted). Finally, we stated,

We do not think that two offenses constitute a single course of conduct simply because they both involve drug distribution. To so conclude would be, in the words of the Fourth Circuit,

> to describe [the defendant's] conduct at such a level of generality as to eviscerate the evaluation of whether uncharged criminal activity is part of the "same course of conduct or common scheme or plan" as the offense of conviction. With a brushstroke that broad, almost any uncharged criminal activity can be painted as similar in at least one respect to the charged criminal conduct.

Id. (citation omitted).

Applying the relevant case law and the express purpose of section 1B1.3, we find that the NNI scheme and the CCC fraud constitute conduct that can "readily be broken into discrete identifiable units that are meaningful for purposes of sentencing." See Maxwell, 34 F.3d at 1010-11. Indeed, our ability to refer to the different frauds merely as "CCC" or "NNI" and yet convey to the reader precisely to which conduct we refer, along with all of the attendant facts relating to that particular swindle, illustrates the wholly distinct nature of each of the frauds involved. To lump these discrete and unrelated frauds together for purposes of defining relevant conduct would require us to ignore the wholly distinct nature of these crimes simply because, at the highest order of abstraction, they both involved frauds. We are not prepared to paint with so broad and undiscriminating a brushstroke.

While Blanc claims that his use of newspaper advertisements and a toll-free number, as well as his conning techniques employed in both cases, render the two schemes part of the same course of conduct or a common scheme or plan, we may readily articulate the numerous, significant differences between the CCC and NNI crimes. Indeed, the fact that

-14-

both the CCC and NNI schemes were frauds is the only thing they have in common. Most obviously, as in Maxwell, the two crimes at issue did not involve the same subject matter; CCC pertained to water-vending machines, whereas NNI concerned greenhouses and plant sales. Also like the Maxwell case, except for defendant himself, the two crimes did not involve any of the same parties. Nor, notably, did Blanc defraud any of the same victims. The CCC and NNI frauds, like the conduct reviewed in Maxwell, also were separated temporally -- in the case at hand, by a few years. We similarly observe that the scope of the CCC and NNI frauds differed: whereas Blanc victimized eighty-four individuals with the NNI con, he preyed on only ten through the CCC fraud.

Even a quick review of the substance of the schemes yields the conclusion that they were different. In the NNI swindle, for example, Blanc duped his victims twice: first, he sold and built for them substandard greenhouses, although he billed them as "state of the art," and second, if his victims were somehow able to succeed despite the handicap placed on them by the deficient greenhouses, Blanc had no one to purchase the plants, although he represented to investors that he had large corporate clients lined up. The CCC con, however, did not require Blanc to build anything. In fact, unlike the NNI Case, where the greenhouses, though defective, at least were delivered, in the CCC scheme, Blanc did not install or operate the water-vending machines that investors purchased. Additionally, in the CCC fraud, Blanc pirated brochure materials of a legitimate water-vending company to entice potential investors. Further, the NNI scheme was substantially more complicated and involved than the CCC fraud. Whereas in the CCC fraud, Blanc simply sold purported interests in water-

vending machines to investors and occasionally provided them with "lulling" checks to lull investors into a false sense of security to prolong the life of the scheme, in NNI, Blanc posed as an investor, took potential investors on tours of facilities he and his co-defendant claimed were plant-purchasing facilities, and lined up fake buyers. The NNI scheme caused victims not only to lose their money, but also to waste their time, effort, and sweat growing plants that would never be purchased by anyone, whereas the CCC swindle resulted only in the victims' loss of money. In short, the "two offenses [do not] constitute a single course of conduct simply because they both involve [fraud]." See Maxwell, 34 F.3d at 1011. Rather, the CCC and NNI schemes may "readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing[,]" see U.S. Sentencing Guidelines Manual §1B1.3, comment (backg'd), and the district court's factual finding that CCC involved a "totally separate scenario or scheme" and "a separate conspiracy" from NNI was not clearly erroneous.

IV.

We therefore conclude that the district court properly held that the CCC scheme did not constitute "relevant conduct" for purposes of sentencing Blanc in the instant case. Accordingly, the judgment of the district court must be, and is, AFFIRMED.