UNITED STATES of America

v.

The OAKFORD CORPORATION, William Killeen, Thomas W. Bock, John R. D'Alessio, Thomas Cavallino, Edward J. Mueger, John J. Savarese, and Mark R. Savarese, Defendants.

No. S2 98 CR 144 JSR.

United States District Court,
S.D. New York.

Dec. 13, 1999.

As Amended Dec. 14, 1999.

Douglas R. Jensen, United States Attorney's Office, S.D.N.Y., New York City, for government.

Richard Greenberg, Gustave Newman, Newman Schwartz & Greenberg, New York City, for Oakford Corp. and William S. Killeen.

Francis Murray, Murray & McCann, Rockville Center, NY, for Thomas W. Bock.

Dominic F. Amorosa, New York City, for John D'Alessio.

Victor J. Rocco, Gordon Altman Butowsky Weitzen Shalov & Wein, New York City, for Thomas J. Cavallino.

Michael Armstrong, Kirkpatrick & Lockhart LLP, New York City, for defendant Edward Mueger.

Benjamin Brafman, Brafman, Gilbert & Ross, P.C., New York City, for defendant John J. Savarese.

Robert Katzberg, Kaplan & Katzberg, New York City, for Mark Savarese.

## OPINION AND ORDER

RAKOFF, District Judge.

Federal law delegates to the New York Stock Exchange (the "Exchange") substantial authority, and responsibility, to police itself and its members. *See* 15 U.S.C. § 78o–3(b)(2), (b)(6), (b)(7), (b)(8), and (h); *see also* § 78s(g). The legal problems posed by the instant case, culminating in the sentencing issues presently before the Court, largely derive from the apparent failure of the Exchange to fulfill that responsibility adequately in its supervision of independent floor brokers.

Independent floor brokers are members of the Exchange who, for a commission, stand ready, willing, and able to execute orders for the purchase and sale of securities on the floor of the Exchange. By reason of their presence on the trading floor, they have access to short-term trading information and trading opportunities denied to the general investing public. *See In Re New York Stock Exchange, Inc.,* Admin.Proc. File No. 3–9925, 1999 SEC LEXIS 1290 (June 29, 1999) ("*SEC Report*") at 6. To prevent floor brokers from taking unfair advantage of this "inside" information, and to foster public confidence in the Exchange, Section 11(a) of the Securities Exchange Act, 15 U.S.C. § 78k, prohibits floor brokers (and certain others) from "effect[ing] any transaction on such exchange for [their] own account, the account of an associated person, or an account with respect to which [they] or an

associated person thereof exercises investment discretion," *id.* Rule 11–a–1(a), 17 C.F.R. § 240.11a–1(a), promulgated by the Securities and Exchange Commission (the "Commission") pursuant to Section 11(a), further provides that:

> No member of a national securities exchange, while on the floor of such exchange, shall initiate, directly or indirectly, any transaction in any security admitted to trading on such exchange, for any account in which such member has an interest, or for any such account with respect to which such member has discretion as to the time of execution, the choice of security to be bought or sold, the total amount of any security to be bought or sold, or whether any such transaction shall be one of purchase or sale.

Finally, willful violations of any of these provisions is punishable as a crime. 15 U.S.C. § 78ff.

Count One of Indictment S2 98 Cr. 144 (the "Indictment") charges that between approximately 1993 and 1997 a Manhattan-based securities firm named The Oakford Corporation ("Oakford") and its two principals, William Killeen and Thomas Bock, conspired with five floor brokers named John R. D'Alessio, Thomas J. Cavallino, Edward J. Mueger, John Savarese, and Mark Savarese, and other unnamed coconspirators, to willfully violate the above-quoted prohibitions by arranging for these floor brokers to obtain beneficial interests in certain Oakford accounts and to use their investment discretion in trading these accounts. *See* Indictment, ¶¶ 15, 22. Count One further charges that, to conceal these unlawful activities, the conspirators agreed to falsify various required records, notably order tickets and invoices, *see* Indictment ¶¶ 18, 19, 23—such falsifications being themselves federal felonies. *See* 15 U.S.C. § 78ff. As a result of this unlawful scheme, the conspirators realized more than $15 million net profits. *See* Preliminary Presentence Report ("Prelim.PSR") for Oakford, 8/30/99, at 15–17 ¶¶ 78–79.[1]

On May 20, 1999, Oakford, Killeen, Bock, Cavallino, Mueger, John Savarese and Mark Savarese all pleaded guilty to Count One.[2] Specifically, they admitted to conspiring to allow the floor brokers to execute occasional discretionary trades in the Oakford accounts, knowing this was unlawful. *See, e.g.,* transcript ("tr.") 5/20/99 at 7, 31, 62–66.

In the manner typical of conspiracy pleas, these defendants' personal statements embraced only a portion of the conduct charged in the count to which the pleas were entered. It is well settled, however, that the Court may take into account for sentencing purposes all relevant conduct that occurred during the commission of the offense of conviction that is either undisputed or, if disputed, is established to the Court's satisfaction after an adequate hearing. *See* U.S. Sentencing Guidelines ("USSG") § 1B1.3 (broadly defining "relevant conduct" and mandating its use in determining sentencing range); USSG § 6A1.3 (after adequate hearing,

---

1. The largest share of the proceeds, approximately $10.3 million, was paid to defendants Cavallino, Mueger, John Savarese and Mark Savarese, pursuant to arrangements, discussed *infra,* by which Cavallino received 70%, and Mueger and the Savarese brothers 90%, of the net trading profits in certain numbered Oakford accounts respectively assigned to each of them. *See, e.g.,* Prelim. PSR for Oakford at 15–17 ¶¶ 78–79. An additional $2.7 million, or more, was paid to other coconspirator floor brokers. Prelim. PSR for Oakford at 17 ¶ 79; PSR for Robert Carucci (another coconspirator), 10/19/98 at 7 ¶ 28. While the exact remaining amount realized by the Oakford principals is uncertain, under the profit-splitting terms of the conspiracy it could not have been less than $2 million.

2. Previously, several of the "unnamed" coconspirators had pleaded guilty to related charges. On May 20, 1999, Killeen and Bock also pleaded guilty to certain unrelated tax charges not discussed herein. Prosecution of the remaining defendant, D'Alessio, was deferred at the Government's request and has now been dismissed pursuant to a Nolle Prosequi dated December 9, 1999.

court may resolve sentencing disputes on basis of any information that has sufficient indicia of reliability to support its probable accuracy); USSG § 6B1.4(d) (factual and other stipulations of the parties not binding on the Court); *see also, e.g., United States v. Watts,* 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997); *Witte v. United States,* 515 U.S. 389, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995); *United States v. Bove,* 155 F.3d 44 (2d Cir.1998); *United States v. Lovaglia,* 954 F.2d 811 (2d Cir.1992); *United States v. Ibanez,* 924 F.2d 427 (2d Cir.1991); *United States v. Fatico,* 579 F.2d 707 (2d Cir.1978); *United States v. Spiegelman,* 4 F.Supp.2d 275 (S.D.N.Y.1998).

Rather more unusually, however, the Government and the defendants, in letter agreements submitted in conjunction with the guilty pleas, stipulated that "on the evidence presently available, there appears to be no basis on which to determine whether a particular trade [in the Oakford accounts] was a Discretionary Trade or a non-Discretionary Trade" and that, consequently, "there is no reasonable basis for calculating [a] defendant's gain, if any, that resulted from the Discretionary Trades." *See, e.g.,* letter dated 5/17/99 from United States Attorney's Office to Michael Armstrong, Esq. ("Mueger Plea Letter") at 2, Section A ¶ 2; letter dated 5/17/99 from United States Attorney's Office to Robert Katzberg, Esq. ("Mark Savarese Plea Letter") at 2, Section A ¶ 2. These stipulations—the net effect of which would be to treat the defendants' misconduct as the equivalent of the least harmful fraud cognizable under the Sentencing Guidelines, *see* USSG § 2F1.1—were sufficiently problematic on their face that the Court, on first being apprised of them, reminded the parties that none of their stipulations was binding on the Court and that the Court might well convene an evidentiary hearing to determine the underlying facts to its own satisfaction. Tr. 5/19/99 at 18–19. After reflecting on this advice for 24 hours, the defendants proceeded with their guilty pleas. Tr. 5/20/99 at 3, 19, 38, 47–48.[3]

Thereupon, the Court referred the matter to the Probation Office for pre-sentence investigation. *See* Fed.R.Crim.P. 32(b). Based on that investigation, the Probation Office drafted preliminary presentence reports that were delivered to the parties in August 1999. In substance, the Probation Office concluded that as a practical matter the floor brokers exercised largely unfettered discretion in the investment of the Oakford accounts assigned to them and that the $15 million net profits realized in those accounts during the conspiratorial period were therefore a reasonable measure of the intended loss or gain attributable to the unlawful conspiracy. *See* Memorandum Order, 9/8/99 (summarizing the preliminary presentence reports). Under this approach, the individual defendants, instead of facing a Count One sentencing range of 0–6 months imprisonment estimated in the parties' letter agreements, *see, e.g.,* Mueger Plea Letter at 3, Section C, would face instead a range of at least 37–46 months imprisonment on that count.[4] *See* USSG § 2F1.1(b)(1)(P).

---

**3.** In the interim, the parties' letter agreements were revised so that, if the Court determined that the sentence range was higher than the parties had stipulated, the defendants could move for a downward departure on the ground that the higher level overstated the seriousness of the offense. *See, e.g.,* letter dated 5/20/99 from United States Attorney's Office to Michael Armstrong, Esq. ("Mueger Modified Plea Letter") at 1; letter dated 5/20/99 from United States Attorney's Office to Robert Katzberg, Esq. ("Mark Savarese Modified Plea Letter") at 1.

**4.** This is because, all other adjustments aside, a reasonably calculable loss or gain of between $10 million and $20 million would add 15 points to the base offense level of 6, whereas an indeterminate loss or gain would add zero points. USSG § 2F1.1. As noted, defendants Killeen and Bock also pleaded guilty to unrelated tax charges (from a different indictment), but the discussion herein will be limited to calculations relating to the Count One conspiracy charge under Indictment S2 98 Cr. 144.

To resolve this disparity and determine the truth regarding this and other material sentencing issues that had arisen in this case, *see* Memorandum Order, 9/8/99, at 2–4, the Court conducted an evidentiary hearing on October 20–21, 1999.[5] At the hearing the Court heard testimony from four coconspirators who had previously pleaded guilty pursuant to "cooperation" agreements with the Government (Christine Beyer, Michael Frayler, Richard Harman, and Angelo Meneghello) as well as from an immunized former employee of Oakford (Mitchell Lown) and a high-ranking enforcement officer of the Exchange (Edward Kwalwasser).[6] The defendants, as was their right, chose not to testify, *see Mitchell v. United States*, 526 U.S. 314, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999), and their counsel chose to waive oral argument at the close of the hearing. Tr. 10/21/99 at 337–40. At the Court's invitation, however, all parties submitted substantial post-hearing briefs, which the Court has carefully considered.[7]

Based on its assessment of the evidence presented at the hearing, in the presentence reports, and in the parties' submissions, the Court makes the following findings and conclusions:[8]

(1) *Discretionary Trading.* It is undisputed that the conspirators agreed that the defendant floor brokers would receive at least 70% of the net trading profits in the relevant Oakford accounts. Tr. 10/20/99 at 84, 93–95, 177, 184, 202; tr. 10/21/99 at 312. It is also undisputed that this substantial return reflected the conspirators' agreement that determination of what stocks to trade and/or when and in what amounts to trade them would be influenced by the exercise of the floor brokers' "expertise," *see, e.g.,* tr. 10/20/99 at 111, 151–52, 161–62, 190; tr. 10/21/99 at 333–34—such expertise materially consisting, the Court finds, in the floor brokers' access to the trading-floor information the use of which Section 11(a) and Rule 11a–1 were intended to circumscribe.

The Court further finds, however, that the defendant floor brokers' role went far beyond recommending, or even soliciting, trades on the basis of such "expertise." Rather, the evidence clearly and convincingly shows that, within a few broad and nebulous parameters largely established at

5. While it is not uncommon for the Probation Department to disagree with the parties' stipulated guideline calculations and to arrive at a higher figure, these discrepancies are usually resolved without resort to an evidentiary hearing. *See* USSG § 6B1.4(d). In this case, however, the Court concluded that the normal deference accorded a presentence report, *see id.,* was outweighed by the need to hear from persons with personal knowledge.

6. Three of the witnesses—Beyer, Frayler, and Meneghello—gave testimony at the hearing that was internally inconsistent in certain respects and/or inconsistent with their prior sworn statements. In addition, all three had given false or misleading statements when initially interviewed by the Government. *See* tr. 10/21/99 at 251 (Beyer's admission); Government Letter Brief, 11/5/99 at 2 n. 1 (as to Beyer, Frayler and Meneghello). While not discrediting these witnesses' testimony in its entirety, the Court, based on a close analysis of these witnesses' various statements and on its observations of their respective demeanors, has discredited certain particulars of their testimony and, in a few instances, has drawn contrary circumstantial inferences from the witnesses' denials.

7. The Court acknowledges with gratitude the excellence of the papers submitted by counsel for each of the various parties throughout this case. Special thanks may be added for the helpful background information set forth in the exhibits to the submissions of counsel for defendant Cavallino.

8. Although the Court disagrees with defendants' argument that the Court's findings, to the extent they go beyond the parties' stipulations or exceed the parties' view of relevant conduct, must be made on clear and convincing evidence, *see, e.g.,* Oakford Brief, 11/4/99 at 5–6; Cavallino Letter Brief, 11/4/99 at 19 n. 11; *cf. United States v. Shonubi,* 103 F.3d 1085 (2d Cir.1997), nonetheless, in an excess of caution, the Court has not made any material finding adverse to any defendant except upon clear and convincing evidence. Additionally, the Court has assumed that the burden of proving any Guidelines calculation that exceeds the parties' stipulations is on the proponent (here, in effect, the Probation Office).

the outset of the conspiracy, *see* tr. 10/20/99 at 76–78, 99–100, 177, 203–204; tr. 10/21/99 at 312–313, the floor brokers personally decided what securities to trade, at what times, in what accounts, in what amounts, and in what manner (purchase or sale). Then, either before or after a given trade was executed—it did not matter— the floor broker making the trade would telephone a lower-level functionary at Oakford with instructions as to how to fill out the Oakford "ticket" necessary to make it look as if Oakford had authorized the trade in advance.

In actuality, however, the Oakford clerk was given no authority to approve or disapprove the trade or, indeed, to do anything but complete the ticket precisely as the floor broker directed. Tr. 10/20/99 at 98, 204–05; tr. 10/21/99 at 315–16. Sometimes, as in the instances to which the defendants affirmatively allocuted in their the guilty pleas, the floor brokers even neglected to call Oakford at all, but the trades still went forward without any protest from Oakford. And in those very rare instances where the floor brokers, contemplating some unusually risky trade, discussed it in advance with the Oakford principals, the trade went forward *even* if the Oakford principals were opposed. Tr. 10/20/99 at 136, 231–33.

Such conduct clearly violates the plain language both of Section 11(a), which prohibits a floor broker from exercising "investment discretion," and of Rule 11a–1, which proscribes a floor broker from initiating "directly or indirectly" any trade for any account with respect to which the floor broker "has discretion as to the time or execution, the choice of security to be bought or sold, the total amount of any security to be bought or sold, or whether any such transaction shall be one of purchase or sale." "Discretion," a common English word not specially defined in the

Securities Exchange Act,[9] simply means in this context "individual choice or judgment," as in (the dictionary's example) "[they] left the decision to his discretion." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 332 (3d Ed.1993). *See also* 4 OXFORD ENGLISH DICTIONARY 756 (2d Ed.1991) ("[l]iberty or power of deciding, or of acting according to one's own judgment or as one thinks fit"); WEBSTER's 3rd NEW INTERNATIONAL DICTIONARY 647 (1993) ("power of decision: individual judgment"). So far as most material aspects of these trades were concerned, and especially such key aspects as timing, the floor brokers acted on the basis of their own judgment and simply reported their decisions to the Oakford clerk. The Court therefore concludes that virtually the entirety of the conspirators' trades violated the ban of Section 11(a) and Rule 11a–1 on discretionary trading by floor brokers.

At all relevant times, however, the enforcement arm of the Exchange took the remarkable position that a floor broker could evade the ban on discretionary trading by the simple expedient of notifying the customer prior to making the trade *even* if the parties had previously agreed that the floor broker would exercise discretion and *regardless* of whether the notification was entirely perfunctory and for the purpose, not of allowing the customer to approve or disapprove the trade, but simply of creating a paper trail. Thus, for example, Edward Kwalwasser, head of the regulatory group of the Exchange during the relevant period, testified at the instant hearing as follows:

Q: [A] floor broker is on the floor, he sees something he likes, calls his clerk ... the clerk calls upstairs to another clerk with the customer, and tells that clerk upstairs, clock me up an order....

---

**9.** The Securities Exchange Act does broadly (but not very helpfully) define the exercise of "investment discretion" to mean, *inter alia,* exercising "such influence with respect to the purchase or sale of securities .... as the

Commission, by rule, determines ... should be subject to the operation [of the securities laws]"—thus referring one back, in this case, to Rule 11a–1. 15 U.S.C. § 78c(35).

And then ... the floor broker executes the order. Is that a violation of Section 11?

A: That is not.

Q. Let us assume that the clerk upstairs had absolutely no meaningful exchange at all with the floor broker's clerk on the floor. Is that a violation of Section 11(a)'s discretionary prong? ....

A: That would be in complian[ce].

THE COURT: Supposing the clerk upstairs had a standing direction from his boss, that whatever the floor broker tells him to do he should do. Would that then be a violation?

A: That would not be a violation....

THE COURT: And you are saying that [the Exchange's] interpretation of the word discretion was that if the customer says ... to the floor broker, "you can trade anything you want in any amount you want at any time you want, and all you have to do is call into my clerk who will have a standing order from me to automatically ... clock an order when you call ...," that would not be an exercise of discretion in violation of the statute or the rule as [the Exchange] ... interpret[ed] it, at the relevant time?

A: That's correct.

Tr. 10/21/99 at 285–87.

The theory behind this anemic interpretation of the ban on discretionary trading by floor brokers is said to be the Exchange's belief that the amount of time, however brief, that it takes the floor broker to relay the information about an upcoming trade to a customer is sufficient to prevent the floor broker from making use of the kind of time and place advantage that the prohibitions of Section 11(a) and Rule 11a–1 are directed against. Tr. 10/21/99 at 285–87 (testimony of Mr. Kwalwasser). However, neither this surmise, nor the crimped interpretation it is said to support, is reflected anywhere in the plain language of Section 11(a) and Rule 11a–1.

Instead, the Exchange's interpretation makes a mockery of the ordinary meaning of "discretion" and creates a convenient escape from the meaningful enforcement of Section 11(a) and Rule 11a–1.

One may even question the Exchange's empirical premise, for certainly the defendant floor brokers in this case found they had sufficient time to make perfunctory calls to Oakford clerks and still reap $15 million in net profits from their short-term trades. The Exchange's interpretation also virtually invites floor brokers to make a time-sensitive trade first and then conceal its discretionary nature afterwards by calling in the trade to a customer's clerk whose time stamp is slightly advanced so as to make the customer's "order" appear earlier. *Cf.* Indictment, Count One, ¶ 18 (alleging similar time-rigging in this case).

Even in the absence of such shenanigans, the Exchange's interpretation virtually obliterates the familiar legal principle that subterfuge cannot substitute for reality and that "de facto" discretion is tantamount to "de jure." *See, e.g.* (in the context of cases involving a broker's excessive trading, or "churning" of a "non-discretionary" account), *Erdos v. SEC*, 742 F.2d 507 (9th Cir.1984); *Mihara v. Dean Witter & Co., Inc.*, 619 F.2d 814 (9th Cir.1980); *Cruse v. Equitable Securities of New York, Inc.*, 678 F.Supp. 1023 (S.D.N.Y.1987); *Jaeger v. Presscott, Ball & Turben*, 1984 WL 1203 (S.D.N.Y.1984); *In Re Roche*, Admin.Proc. File No. 3–8370, 1997 SEC LEXIS 1283 (June 17, 1997).

Erroneous though the Exchange's interpretation be, it is said to have been the Exchange's consistent interpretation throughout the period of the defendants' conspiracy. Tr. 10/21/99 at 262 (testimony of Mr. Kwalwasser). Furthermore, although it is unclear whether the Exchange's interpretation was expressly communicated to floor brokers on the Exchange, *see* tr. 10/21/99 at 295 (testimony of Mr. Kwalwasser), it appears, at least from the reported decisions, that during the relevant period no floor broker was

disciplined by the Exchange for violation of the anti-discretion provisions of Section 11(a) and Rule 11a–1 except where the broker had had no prior communication with the customer before making the trades or under other circumstances not relevant here. *See, e.g.,* Cavallino Letter Brief, 9/1/99 at 17 n. 14; Savarese Letter Brief, 8/31/99 at 3–4 and Ex. B.

Under the circumstances, the Court cannot conclude, at least for sentencing purposes, that the defendants were given fair notice that their arrangements constituted unlawful discretionary trading, except with respect to those instances where they had no prior contact with the Oakford clerk before executing the trades. This is not so much a matter of lack of wrongful intent—for there is ample evidence (*see infra*) that the defendants knew in general that what they were doing was wrong and sought to conceal it.[10] Rather, what they lacked was not so much *mens rea* as fair notice of where the line was being drawn between dubious borderline activity and forbidden violations of law. For present purposes, the failure of the Exchange to enforce the relevant laws as written deprived the defendants of fair notice that their "borderline" activity had in fact crossed the border. *See generally, e.g., City of Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 1860, 144 L.Ed.2d 67 (1999).

■ Accordingly, so far as the instant Guidelines calculations are concerned, the defendants' intended loss or gain from discretionary trading may be premised only on the kind of discretionary trades that the Exchange clearly forbade at the time, *i.e.,* the trades to which the defendants affirmatively allocuted. The Court agrees with the parties that there is insufficient evidence to reasonably determine the intended loss or gain applicable to these occasional trades, since they were intermingled with the defendants' other trading.

■ That does not mean, however, that the Court agrees with the parties' stipulated Guidelines range or that the prior discussion is irrelevant to the determination of that range. To begin with, even though the parties, utilizing the general Guidelines provisions for crimes premised on fraud and deceit, place the base offense level at six, *see* USSG § 2F1.1(a), the Court finds that the conduct is more closely analogous to the offenses covered by § 2F1.2 (Insider Trading), which carries a base offense level of eight. Specifically, the Commentary to § 2F1.2 provides that "[c]ertain other offenses . . . that involve misuse of inside information for personal gain also may appropriately be covered by this guideline." The heart of Section 11(a) and Rule 11a–1 is the protection of ordinary investors against floor brokers' (and others') actual or perceived misuse, for personal gain, of their special access to non-public trading floor information. USSG § 2F1.2 is therefore appropriately applied to defendants' violations of these provisions.

■ Even if this were not so and the sentence is to be calculated under USSG § 2F1.1, the Court finds, alternately, that treating the defendants' conduct as the equivalent of a fraud that contemplated little or no loss does not fully capture the harmfulness and seriousness of the defendants' conduct, so that an upward departure of two points from the base offense level of six is warranted. USSG § 2F1.1, Application Note 11. This is not only because the defendants' misconduct was accompanied by numerous acts of deception and deceit (*see infra*) but also because, even within the narrow framework of the misconduct to which the defendants affirmatively allocuted, the offense caused a loss of confidence in an important institution, the New York Stock Exchange. *See* the *SEC Report* (chastising the Exchange for not detecting such corrosive conduct);

---

**10.** This is usually sufficient for "willful" criminal intent under the securities laws. *See, e.g., United States v. Dixon,* 536 F.2d 1388, 1397 (2d Cir.1976). *See generally,* J.S. Rakoff, *'Willful' Intent in Criminal Securities Cases,* N.Y.L.J., May 11, 1995, at Bus.Crim. p. 3.

*see also, e.g.,* Gary Weiss, *Can The Big Board Police Itself?* BUSINESSWEEK, Nov. 8, 1999, at 154; Greg Ip and Ann Davis, *Floor–Brokers Case Is Proving To Be Awkward For Big Board,* WALL ST. J., Oct. 28, 1999. Thus, on either approach, the base offense level is eight.

As to the rest of the calculation, the Court agrees with the parties' stipulations, *see, e.g.,* Mueger Plea Letter at 2, Section A, that two points should be added to the offense level for "more than minimal planning," *see* USSG § 2F1.1(b)(2), that another two points should be added for abuse of a position of trust, USSG § 3B1.3, and that two points should be subtracted for "acceptance of responsibility," USSG § 3E1.1. The total offense level for the defendants' conspiracy to violate the ban on discretionary trading by floor brokers is therefore ten.

(2) *Trading For An Account In Which One Holds An Interest.* As alleged in Count One, there is another way to view the conduct that was the subject of the evidentiary hearing in this case, to wit, as a conspiracy among the Oakford principals and the floor brokers to trade for accounts in which the floor brokers had an interest, in violation of the provision of Section 11(a) that prohibits a floor broker from "effect[ing] any transaction on [the] Exchange for [the broker's] account" and the proscription of Rule 11a–1 that "[n]o member of a national securities exchange, while on the floor of such exchange, shall initiate, directly or indirectly, any transaction on any security admitted to trading on such exchange, for any account in which such member has an interest...." [11] In an investigation arising from this very case,

the Commission has now authoritatively interpreted these proscriptions to apply to situations, such as the instant conspiracy, in which the floor brokers' compensation was a percentage of the account's trading profits. *See SEC Report* at 8. As stated by the Commission, "any compensation arrangement that results in the exchange member sharing in the trading performance of an account, however structured, makes the account that member's 'own account,' or constitutes an 'interest' in the account, for purposes of Section 11(a) and Rule 11a–1." *Id.* at 8.

To be sure, this bright-line rule may not have been as clearly defined during the period of the defendants' conspiracy. Tr. 10/21/99 at 264, 294 (testimony of Mr. Kwalwasser). But, in contrast to the situation involving discretionary trading where the Exchange held fast to an exceedingly narrow and wooden interpretation of the relevant prohibitions, the Exchange interpreted the ban on a floor broker's trading in an account in which he held an interest somewhat more flexibly, requiring that the interest be "proprietary" in nature before the ban would apply but otherwise examining the full circumstances. Tr. 10/21/99 at 264–67, 273–77, 294 (testimony of Mr. Kwalwasser). Thus, for example, as Mr. Kwalwasser testified, the Exchange, if it had known at the time of the defendant floor brokers' very large percentage "commissions" (which it did not), would have regarded them as suggestive, though not conclusive, of the floor brokers' having forbidden interests in the Oakford accounts. *Id.* at 266–67.

---

**11.** *United States v. Mullins,* 971 F.2d 1138 (4th Cir.1992)—on which defendants rely in arguing that conduct supporting a finding that defendants violated the above-quoted provisions is not "relevant conduct" within the Guidelines in sentencing defendants for the exercise of unlawful trading discretion to which defendants allocuted, *see* Oakford Brief, 11/4/99 at 5—is entirely distinguishable, as it involved two unrelated frauds. In that case, the Fourth Circuit held that because, *inter alia,* the conduct underlying the charged fraud was both dissimilar to and temporally disconnected from the conduct underlying an uncharged fraud, the uncharged fraud did not constitute relevant conduct in sentencing for the charged fraud. *Id.* at 1143–1145. In contrast, in the instant case the conduct underlying the violations of Section 11(a) for discretionary trading and for trading in an account in which the floor broker has an unlawful interest is inextricably intertwined.

Nor was the potential for violating Section 11(a) and Rule 1a–1 by sharing in a customer's profits hidden from the members of the Exchange. As stated in the *SEC Report:*

> Since at least 1991, the NYSE understood that if an Independent Floor Broker were to share in the profitability of an account, the Independent Floor Broker executing orders for that account on the NYSE Floor might violate Section 11(a)(1) and Rule 11a–1, unless it could claim entitlement to an applicable exception. In 1991, the NYSE's Market Performance Committee established a Committee on Trading for Eighths (the "Trading for Eighths Committee") to study the growing practice of intra-day trading. The Trading for Eighths Committee, comprised of NYSE members, presented its report to the Market Performance Committee in January 1992. The report noted that if an Independent Floor Broker is compensated for his services based on the profitability of transactions in such a way that he becomes, in effect, a "partner" with his customer in the trade, such a broker may then become subject to the restrictions contained in Section 11(a).

*SEC Report* at 15 (footnote omitted).

Unfortunately, even as the Exchange's interpretation of the ban on discretionary trading by a floor broker proved (as previously described) anemic, its enforcement of the prohibition against a floor broker's trading for an account in which he held an interest proved downright anorexic. As the *SEC Report* further found:

> Having specifically noted that a broker's compensation arrangements could indicate that the broker was a "partner" with the customer, and therefore that the broker held a proprietary interest in the customer's account, the NYSE failed to police brokers' compensation arrangements as a means of detecting such improper interests. Rather, the NYSE's then-existing methods of reviewing compensation arrangements were limited to reviewing commission bills (in such circumstances where those bills had been created) to confirm that the commissions indeed had been billed, and following up where anomalies were noted. The NYSE failed to establish surveillance procedures designed to evaluate how those commissions were computed, or to examine on a routine basis the payments flowing from the customer to the Independent Floor Broker in order to determine if those payments were based on a profit-sharing arrangement.

*Id.* at 16–17.[12]

As a result, the defendant floor brokers here, by falsifying their commission invoices (see *infra*), were able to conceal the true nature of their unlawful partnership with the Oakford principals in the specially-numbered Oakford accounts allocated to the floor brokers. The Court, however—based on what it now knows from the evidentiary hearing and other submissions—has no difficulty in finding by clear and convincing evidence that the defendants intentionally entered into arrangements designed to evade and violate the proscriptions of Section 11(a) and Rule 11a–1 against a floor broker's trading in his own account or in an account in which he held an interest.

The terms of those arrangements, the Court finds, were first, the creation of joint ventures to which the Oakford principals

---

**12.** Both in response to the Commission's inquiries and in his testimony to this Court, Mr. Kwalwasser attempted to justify the superficiality of such inspection on the ground that any further policing would violate the statutory ban on the Exchange's setting commission rates. *See* tr. 10/21/99 at 270–71 (testimony of Mr. Kwalwasser); Testimony of Mr. Kwalwasser before the SEC, tr. 1/27/99 at 226, Ex. A to Cavallino Brief, 11/1/99. This argument is without merit, as the statute simply precludes the Commission, and therefore the Exchange, from "impos[ing]" or "fix[ing]" commission rates, not from inquiring into whether the commission stated was the commission actually paid. *See* 15 U.S.C. § 78f(e).

would contribute most of the initial capital while the defendant floor brokers would contribute their access to non-public trading information derived from their presence on the floor of the Exchange and their ability to translate that access into quick and profitable trades that they would essentially determine on their own initiative.

Second, the profits from those trades would be split among the conspirators, with the floor brokers receiving the lion's share—70% of the profits in the case of floor brokers like Cavallino who simply contributed their "expertise" and 90% of the profits in the case of brokers like Mueger and the Savarese brothers who also contributed capital in the form of undocumented "loans" to Oakford. *See* Prelim. PSR for Thomas Cavallino, 8/25/99, at 15 ¶ 74; Prelim. PSR for Edward Mueger, 8/20/99, at 17 ¶ 80; Prelim. PSR for John Savarese, 8/24/99, at 18 ¶ 87; Prelim. PSR for Mark Savarese, 8/24/99, at 18 ¶ 86; Savarese Letter Brief, 11/4/99 at 12.[13]

Third, while Oakford would ostensibly bear the nominal risk of any loss that might occur—a loss that was limited by Oakford's own capital limits and that, in any event, was unlikely to be substantial in view of the inherent value of the floor brokers' inside information—in practice, financial responsibility for the only substantial losses that occurred was to be borne in whole or part by the floor brokers who authorized the trades. *See* tr. 10/20/99 at 137–140 (testimony of Angelo Meneghello, a floor broker member of the conspiracy who, having at one point incurred a major loss in the Oakford account assigned to

him, traded for a year in that account without receiving any "commissions" from Oakford in an effort to make up the loss); *id.* at 234 (testimony of Christine Beyer, another floor broker member of the conspiracy, who bore half of a major loss incurred in the Oakford account assigned to her, the other half being absorbed by Oakford).

Thus, from the standpoint of economic reality, the arrangements were joint ventures or partnerships, and the characterizations of the floor brokers' percentage interest as "commissions" and their capital contributions as "loans" were simply camouflage. Moreover, the defendants' realization of this reality was confirmed, among other ways, by their use of false invoices (discussed *infra*) to conceal their percentage takes.[14]

In short, the Court concludes by clear and convincing evidence that the conspirators knowingly and wilfully arranged for the floor brokers to hold unlawful interests in the Oakford accounts. The defendants' relevant unlawful conduct thereby includes responsibility for all the trades that occurred in those accounts during the relevant period.

On the basis of these findings, the offense level under USSG § 2F1.1, which starts at six, would then be increased by 15 points to a level of 21, because the intended loss or gain was more than $10 million. *See* USSG § 2F1.1(b)(1)(P) and Application Notes 7 and 8. The Court finds, however, that such an increase would substantially overstate the seriousness of the offense and warrants the kind

---

13. While counsel for the Savarese brothers seemingly dispute whether the amounts they contributed to Oakford were "loans" or for the purpose of creating "error accounts," *see* Savarese Letter Brief, 11/4/99 at 12, it remains undisputed that those floor brokers who paid some money to Oakford received 90% of the subsequent net trading profits and that those who did not received 70%. Moreover, on any analysis, the fact that the Savarese brothers were able to obtain the ex-

traordinary return of 90% is further evidence on its face that they were effectively partners in their ventures with Oakford.

14. In addition, coconspirator Richard Harman, whom the Court found particularly credible, openly confessed to his knowledge of the unlawfulness of the conspiratorial conduct at the time it was executed. Tr. 10/21/99 at 317.

of downward departure contemplated by the revised letter agreements between the parties. *See* USSG § 2F1.1, Application Note 11, last paragraph; *see also, e.g.,* Mueger Modified Plea Letter at 1.

Three considerations, in particular, warrant such a downward departure. First, each of the defendants personally realized only a small portion of the overall gain or profits of $15 million. Second, the Exchange's approval, however qualified, of the practice of "trading on eighths"[15] arguably acknowledged the possibility of a commission equivalent to 50% of net profits, and thereby tacitly encouraged floor brokers to "push the envelope" in this area. *See* Testimony of Mr. Kwalwasser before the SEC, tr. 1/26/99 at 87–89, 94–95, 112, Ex. A to Cavallino Brief, 9/1/99; *Report of the Committee on "Trading for Eighths"* at 3 ¶ 6, Ex. I to Cavallino Brief, 9/1/99 (report of a committee created by the Exchange in 1991 to examine the propriety of trading on eighths, concluding that while high percentage commissions may under some circumstances constitute an illicit partnership between broker and customer and thus violate the ownership prong of Section 11(a), they are not a *per se* violation).[16]

Third, and most importantly, it must be remembered that the defendants did not specifically allocute to the part of the conspiracy charge relating to the proscription against a floor broker's trading in an ac-

count in which he holds an interest and that the parties' negotiated plea bargains did not seek to hold the defendants responsible for this object of the conspiracy. While the Guidelines are clear that even an explicit "plea agreement not to pursue a potential charge shall not preclude conduct underlying such charge from being considered under the provisions of § 1B1.3 (Relevant Conduct) in connection with the count(s) of which the defendant is convicted," USSG § 6B1.2(a), it is still appropriate for the Court to give substantial weight to the determinations of the Executive implicit in a negotiated plea bargain, to the natural reliance of a defendant on the likelihood that a court will not stray too far from such a bargain, and to the interests of justice in encouraging such bargains. *Cf. United States v. Gonzalez–Bello,* 10 F.Supp.2d 232, 237 n. 3 (E.D.N.Y.1998).

For all these reasons, the Court concludes that to determine the Guideline offense level on the basis of the full amount of conspiratorial profits realized by the defendants on the trades undertaken in the accounts in which they knowingly held unlawful interests would, in this case, materially overstate the seriousness of that conduct, and that, instead, the Court should downwardly depart 13 points and treat the basic offense at the same eight-point level as under the discretionary trading approach, *supra.* To this level, as before, two points must be added for more than minimal planning, two points must be

---

**15.** The practice known as "trading on eighths" consists, roughly, of a floor broker entering the floor with two trade orders from the same customer and for the same security, one to buy and one to sell, and using these simultaneous orders to attempt to capture the difference between the security's bid price and offer price by making a series of rapid sales and purchases according to which of the two prices is temporarily higher. As compensation for this time-intensive practice, it was typical during the relevant period for floor brokers to receive commissions that translated into as much as 50% of the net profits on these trades. *See* Testimony of Mr. Kwalwasser before the SEC, tr. 1/26/99 at 88–89, 112, Ex. A to Cavallino Brief, 9/1/99.

**16.** More specifically, the report concluded that "commissions are freely negotiable under federal law, and . . . it may be very difficult to determine when a broker's compensation for his services is such that he ought to be viewed as a 'partner' in a transaction," that "any such determination may involve a review of records over a period of several months with a view toward establishing a broker's 'intent,'" and that "such a matter is, in any event, within the purview of the Exchange's Regulatory Group and not the Committee." *Report of the Committee on "Trading For Eighths"* at 3 ¶ 6. As already noted, the Exchange's regulatory group elected not to engage in such scrutiny. *See SEC Report* at 16–17, discussed *supra.*

added for abuse of a position of trust, and two points must be subtracted for acceptance of responsibility, leading once again to a total offense level of ten.

(3) *False Records.* The same conspiratorial conduct that resulted in the defendants' violations canvassed in the preceding sections also involved the preparation of false trading records, as charged in Count One, in violation of 15 U.S.C. § 78ff. *See also* 17 C.F.R. §§ 240.17a–3 and 17a–4. Among other such things, the conspiracy contemplated that the defendant floor brokers, in furtherance of the conspiracy, would cause to be prepared and sent to Oakford invoices for the trades here in issue that falsely purported to bill Oakford for non-profit-based "commissions" at standard rates such as $3 per 100 shares traded. Tr. 10/20/99 at 29, 78–79, 143, 177; tr. 10/21/99 at 251.

Defendants argue that these invoices were not false because it was common practice in the industry for floor brokers to submit similar bills knowing that large customers would discount the bills and pay a smaller rate, such as $1.50 per 100 shares traded. Tr. 10/20/99 at 79–80, 143, 197–98. But whereas that practice simply reflects the difference between the "standard" rate that the floor brokers believed they should receive and the "discounted" rate that large customers were able to force upon the floor brokers, here both the floor brokers and the customer (Oakford) knew from the outset that the commission rate that they had agreed upon, *i.e.* 70% to 90% of the net profits, was entirely different in kind from the rate set forth in the invoices. They had neither hope nor expectation that Oakford would pay the set dollar rate appearing on the statements nor a discount therefrom. Rather, the Court finds, the sole purpose of setting forth such a rate was to conceal the unlawful profit-sharing arrangements in which the defendants were actually engaged.

Indeed, the Court finds that the defendants knew that, as the *SEC Report* later confirmed, the Exchange's chief method of detecting violations of Section 11(a) and Rule 11a–1 was to inspect such invoices for any apparent anomalies.[17]  *SEC Report* at 17. Indeed, at the very outset of their conspiratorial relationship, Meneghello was told by Killeen to falsify the invoices in this manner "[i]n case we were audited by the New York Stock Exchange." Tr. 10/20/99 at 77–81. Beyer and Frayler understood likewise, tr. 10/20/99 at 177, 182–83, 216–19, and as a consequence, all three initially lied to the prosecuting authorities and pretended that the falsely billed rates were the actual rates of their commissions. Tr. 10/21/99 at 251 (testimony of Beyer); Government Letter Brief, 11/5/99 at 2 n. 1 (as to Beyer, Frayler and Meneghello). Beyer, moreover,—during a period in which she was incurring losses and thus receiving no actual income from Oakford—was induced by the Oakford principals to falsify an entire complicated series of records in order to conceal that none of her invoiced commissions was being paid in any respect during this period. Tr. 10/20/99 at 227–29.

■  While the false invoices are by no means the only false records prepared in furtherance of the conspiracy, they are the most important ones because they were intended to extend to most of the trades and thus keep the Exchange front obtaining even a glimpse of the underlying illegality. As such, they warrant a starting offense level of eight, consisting of a base offense level of six and a two point upward departure resulting both from the fact that the false statements were made for the purpose of facilitating another crime and because the offense caused a loss of confidence in an important institution, the Exchange. USSG § 2F1.1, Application Notes 11(b) and 11(e). To this, yet again, two

**17.** Thus, the defendants' argument that the Exchange could have discovered the true commission structure by examining the records of Oakford's clearing agent, Spear Leeds, is an irrelevancy; for, as the conspirators well knew, the slipshod enforcement practices of the Exchange rarely extended beyond checking the invoices.

points must be added for more than minimal planning, two points must be added for abuse of a position of trust, and two points must be subtracted for acceptance of responsibility, leading to a final offense level of ten.

In summary, no matter how defendants' conduct under Count One is viewed, the proper Guidelines offense level is ten.[18] For the floor broker defendants, all of whom have a Criminal History Category of I, this translates into a sentencing range of 6–12 months. (For the Oakford principals, the ultimate range will be appreciably longer because of their pleas to the unrelated tax charges.). Accordingly, the Probation Office is directed to prepare final presentence reports based on the calculations determined by this Order. Counsel are reminded that the sentences in this case will go forward on January 7, 2000 in Courtroom 14B, 500 Pearl Street, New York, N.Y.

SO ORDERED

---

18. Because the three approaches described herein all involved closely interrelated conduct, any grouping of the three together would still result in a total offense level of ten. *See* USSG § 3D1.2.