[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-17164
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 20, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 08-00010-CR-1-5

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM JERRY AUGER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(July 20, 2009)

Before TJOFLAT, EDMONDSON and HULL, Circuit Judges.

PER CURIAM:

After pleading guilty, William Jerry Auger appeals his 46-month sentence

for maintaining drug-involved premises, in violation of 21 U.S.C. § 856(a)(2). Auger, who leased a 1,342-acre tract of land, permitted Geraldo Hernandez to use a portion of the land to grow marijuana. After review, we affirm the district court's determinations as to relevant conduct under U.S.S.G. § 1B1.3, but vacate Defendant Auger's sentence and remand for fact findings as to the number of seedlings seized and whether those seedlings constitute "plants" for the calculation of drug weight under U.S.S.G. § 2D1.1(c).

## I. BACKGROUND

To inform the sentencing issues, we first outline the facts and procedural history in detail.

### A. Offense Conduct

According to the presentence investigation report ("PSI"), on July 22, 2006, an off-duty sheriff's deputy flying an aircraft over Coffee County, Georgia, observed a large quantity of marijuana growing in a rural area. The sheriff's deputy notified local authorities, who investigated and learned that Defendant Auger leased the land. In paragraph 6, the PSI reported that Auger's property had 8,664 marijuana plants, described as 600 seedlings and the rest as tall plants:

> The local authorities seized approximately 8,664 marihuana plants from the site, described as being approximately 600 seedlings or small plants and the rest of the plants being between 3 and 4 feet tall. In addition, the local authorities observed two cook/campsites including

2

tents, food, an ice chest, a nursery for starting plants, and an area with larger plants. The sites had running water through an elaborate irrigation system which used nearby natural water sources. One of the tents had the name "CHINO" sprayed on it.

The property was locked with cables at each entrance, indicating that whoever tended the marijuana had keys to open the cables.

The sheriff's office contacted federal Drug Enforcement Administration ("DEA") Special Agent Stephen Tinsley. On July 31, 2006, Agent Tinsley and two other DEA agents assisted the sheriff's office in executing a search warrant for Auger's residence. Auger first denied knowing of the marijuana growing operation. Agent Tinsley testified at the sentencing hearing that he took Auger to the growing site. When they returned to Auger's residence, Auger indicated he was "ready to talk now." According to the PSI, Auger admitted that a man named Andy, later identified as Geraldo Hernandez, approached him and asked him to provide land to grow marijuana. Auger agreed to show Hernandez the land in exchange for some marijuana for his personal use.

According to Auger, he met with Hernandez and two other Hispanic males at his residence to discuss the details of the marijuana growing process. Auger reported that he agreed to let Hernandez plant between 100 and 150 marijuana plants in exchange for ten percent of the finished project. Auger took Hernandez and his associates to an area on the property with power lines and gave them

3

permission to plant in the area north of the power lines. Auger's residence was a quarter of a mile from the entrance to the property and four miles from the growing site.

After the initial meeting, Auger met with Hernandez and three Hispanic men at his residence on several occasions "to discuss more details and to keep Auger informed of the growing process." Hernandez indicated that he and his associates were staying in the woods to tend to the plants. Auger gave Hernandez keys to the property and a water pump and bought Hernandez a cell phone for communication purposes.

Auger also reported to the probation officer that, after thinking for several days about permitting Hernandez to use his property, he told Hernandez and his associates to stop and leave the property. Auger stated that he did not return to the property once the growing process began. He denied knowing that Hernandez and his associates were growing more than the agreed upon 100 to 150 plants.

In paragraph 13, the PSI stated that, although Auger denied knowing about the additional plants, a preponderance of the evidence supported holding Auger accountable for all the plants seized on the property, as follows:

> Although Auger denies knowledge of the quantity of marihuana plants being grown, he indeed gave permission for marihuana [to] be grown on the property. He provided keys to the growers and supplied them with a water pump for irrigation purposes. In addition, he admitted to

4

buying Geraldo Hernandez a cell phone for communication purposes. Auger also informed authorities that he was provided with details by Geraldo Hernandez and his codefendants regarding the growing process on numerous occasions. Finally, Auger's assertion that he never ventured onto the property where the marihuana was being grown, even though he lived only a short distance from it, appears highly suspect and unlikely. Therefore, the probation officer submits that the preponderance of the evidence supports the conclusion that Auger should be attributed with the total amount of marihuana plants seized during the investigation.

## B.    PSI Calculations & Objections

The PSI recommended attributing to Auger 866.4 kilograms of marijuana based on (1) the 8,664 plants seized on the property, and (2) each plant being equivalent to 100 grams under the Sentencing Guidelines. Because the parties agreed in the plea agreement that Auger had little or no participation in the underlying controlled substance other than allowing the use of his premises, the PSI recommended a base offense level of 26, pursuant to U.S.S.G. § 2D1.8(a)(2). After a three-level decrease for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a)-(b), Auger's total offense level was 23. With Auger's criminal history category of I, the PSI recommended an advisory guidelines range of 46 to 57 months' imprisonment.

Auger objected to the PSI's determination in paragraph 6 that 8,664 "plants" were seized on his property. Under U.S.S.G. § 2D1.1, a "plant" is defined as an organism that has leaves and a readily observable root formation, such as roots, a

5

rootball or root hairs. See U.S.S.G. § 2D1.1(c) cmt. n.17. Auger argued that the evidence was unclear as to the number of "plants" seized, as that term is defined by the Sentencing Guidelines.

Auger also objected to paragraph 13 of the PSI, which attributed 866.4 kilograms of marijuana to him for purposes of computing his offense level. Auger argued that it was not reasonably foreseeable to him that Hernandez and his associates would grow more than the agreed upon 100 to 150 plants and that there was no evidence to support the PSI's conclusion that it was "suspect" or "unlikely" that Auger did not venture onto the part of his property being used to grow marijuana. Auger also pointed out that the evidence did not show that these plants had readily observable root formations, as required by § 2D1.1(c).

In an addendum to the PSI, the probation officer responded to Auger's objections. As to paragraph 6, the probation officer stated that (1) DEA records indicated that Coffee County law enforcement seized approximately 8,664 marijuana plants, and (2) DEA Agent Tinsley confirmed the amount of marijuana plants seized. According to the PSI addendum, although Agent Tinsley did not count the plants, he observed the plants with root formations[1] and "determined that

---

[1] However, as outlined later, in his testimony, Agent Tinsley said nothing about root formations. Furthermore, contrary to the PSI's statement that 600 of the 8,664 plants were seedlings, Agent Tinsley testified that the majority of those plants were seedlings.

the amount of plants that were approximated appeared appropriate." The probation officer pointed out that, even if the local authorities' count was off by 1,000 plants, Auger's base offense level would remain the same.

As to the relevant conduct objection, the probation officer stated that it was appropriate to hold Auger accountable for all of the plants found on his property. The probation officer pointed out that: (1) Hernandez and his associates depended on Auger's cooperation for their venture to succeed and would not have grown more than was agreed to given that Auger's proximity to the site meant that he "could easily visit the site at anytime"; (2) Auger met with Hernandez and his men several times regarding the growing process; (3) Auger provided them with a water pump and a cell phone and let the men reside on the property, all of which indicates significant planning and an intent to grow a larger, rather than a smaller, quantity of marijuana; and (4) at a minimum, Auger deliberately chose to remain ignorant of the scope of the growing operation.

## C.    Sentencing Hearing

At sentencing, Auger renewed his objection to the number of marijuana plants (8,664) attributed to him for purposes of calculating his offense level. The district court noted that, even if the authorities' count had been off by 1,000 plants, Auger's sentencing range would have been the same. The court rejected Auger's

claim that he agreed to Hernandez's growing only 100 to 150 plants, finding it "inconceivable":

> [O]nly planting a hundred or a hundred and fifty plants is – I mean, that's something you can do in buckets out in your backyard. And here they were out in this whole big field with over a thousand acres leased, and [Auger] went out there with them and specified the area they could plant it. And then he had further discussions with them about planting it, and what percentage he was going to get of the plants . . . . And for any person to reasonably believe under the circumstances of this case that you're only talking about a hundred or a hundred and fifty marijuana plants, I mean, that's like asking me to believe that Santa Claus is going to really come down the chimney in a couple of weeks.

Auger's counsel countered that, according to the PSI, Auger was supposed to receive ten percent of the yield for his personal use and tried to call the agreement off after a few days, which made it "actually inconceivable" that he agreed to let them grow over 8,500 plants. The district court rejected this personal-use argument, finding it "hard to swallow," as follows:

> Well, but that's what the defendant says. That's the deal they struck. And, you know, he lived a quarter-of-a-mile from the field. I mean, he lived a quarter-of-a-mile from the entrance of the field, okay. He lived about four miles from the actual field where the marijuana was growing. He went out there, and they looked at it, and they talked about where the power lines went through, and where they would be permitted to grow, and all this kind of stuff. And it went on for a long period of time. And whether he said, I'm getting ten percent for my own personal use, or whether he planned on distributing that – I mean, all the plants that were there and all the plants that were found there, you know, if he had got ten percent for his own personal use, he'd be lighting up every day till he got to be a hundred years old, I guess.

8

So – but anyway, I'm listening to what you're saying, but it's kind of hard to swallow it.

Auger also argued that the 8,664 plant count was based on hearsay evidence that did not "bear any indicia of reliability" and that would not be admissible "even for purposes of a sentencing hearing." The government responded to the defense objections by stating that it concurred with the findings in the PSI and that the plant count was accurate.

After hearing the parties' arguments, the district court adopted the statements in the PSI and the addendum. The district court found that Auger had a total offense level of 23 and a criminal history category of I, which yielded an advisory guidelines range of 46 to 57 months of imprisonment. After considering the factors in 18 U.S.C. § 3553(a), the district court imposed a 46-month sentence.

After the district court pronounced the sentence, Auger renewed his objection to the drug weight being 866.4 kilograms. Auger argued that the court's findings as to weight "were not based on a sufficient evidentiary showing . . . to establish by a preponderance of the evidence that the requisite number of plants, as that term is defined by the sentencing guidelines, were attributable to the defendant." The district court then allowed the government to call DEA Agent

9

Tinsley to testify.[2]

Agent Tinsley testified that the law enforcement agencies collected the plants on July 22, 2006, the day the growing operation was spotted by a sheriff's deputy from the air. Agent Tinsley was contacted a week later, on July 28, and asked to assist with the investigation. Agent Tinsley went to the Coffee County Sheriff's Office and met with two detectives, who showed him the plants in their drug vault.

Agent Tinsley later received documents from the Coffee County Sheriff's Office and the Altamaha Drug Task Force, run by the Georgia Bureau of Investigation ("GBI"), both of which indicated that 8,664 plants had been seized. Agent Tinsley explained that, because of allegations of corruption in the Coffee County Sheriff's Office, the GBI was asked to "collect the evidence there on the scene from the hunting lease" and to conduct an independent count of the plants. According to the GBI report that Agent Tinsley received, GBI Special Agents Shane Mathis and America Lopez collected and counted the plants. The counts by the Coffee County Sheriff's Office and the GBI were "the same number or very close to the same number." Agent Tinsley opined that, based on what he had seen

_____

[2]When the government called Agent Tinsley to testify, Auger objected on hearsay grounds. The district court overruled the objection, stating "hearsay is admissible at a sentencing hearing, and I can hear the hearsay regarding the weight; I can hear it regarding the relevant conduct."

in the drug vault, the photographs of the growing site, his walk-through of the growing site and his experience in seizing and counting marijuana plants, the 8,664-plant count appeared to be accurate within 1,000 plants.[3]

On cross-examination, defense counsel brought out that the majority of the 8,664 plants were "seedlings." Specifically, Agent Tinsley explained that when he observed the plants in the drug vault, they were kept in one to three trash bags. During his visit, Agent Tinsley held in the palm of his hand several thousand plants "in the nursery stage" that had been removed from small plastic trays. Agent Tinsley described the plastic trays as 24 inches by 12 inches in size and consisting of 50 cubicles. According to Agent Tinsley, the majority of the plants were in these plastic trays and were "seedlings," and "additional plants [were] planted in the ground." Agent Tinsley did not testify as to whether he observed any root formations on the seedlings or plants.[4]

_____

[3]The government pointed out that the law enforcement reports of the plant count were given to defense counsel during discovery. The government did not introduce those reports in evidence. Instead, the only evidence is Agent Tinsley's testimony.

[4]When Auger's counsel asked Agent Tinsley about a press release issued by the Coffee County Sheriff's Office after the plant seizure, the government objected. Auger argued that the questioning was relevant to the reliability of the plant count. The district court responded, "Well, how about the indicia of reliability when your client first denies any involvement and says, I'm not involved in any way. I don't know anything about it, don't have anything to do with it. And then he later decides, well, maybe it's in my favor to admit to what happened. Does that change the situation, counsel?" When defense counsel stated that it did not, the district court stated, "And then he insists to the probation office that he's only talking about a hundred or a hundred and fifty plants? I mean, give me a break."

When defense counsel questioned Agent Tinsley about the reliability of the Coffee County Sheriff's Office report, the district court disallowed that line of inquiry. The district court emphasized that Agent Tinsley testified that he was an agent for nineteen years and had personally visited the field and then observed the plants in the trash bags at the drug vault and in the "little potty things" and "put them in his hand."

After Agent Tinsley's testimony, Auger argued that, for purposes of weight calculations in the guidelines, a "plant" is a term of art referring to a large, independent plant with a readily observable root formation and that seedlings are not "plants" for this purpose. Auger stressed that 8,664 plants cannot occupy only one to three trash bags. Auger also argued that the weight calculation was based on information from an unreliable source. But, even if the source had been reliable, Auger asserted that the weight calculation was improper because it appeared to be based on an ordinary understanding of "plant" rather than its legal definition in the guidelines. Auger contended that, in the absence of sufficient evidence of 8,664 plants, he should be held accountable only for the 100 to 150 plants to which he admitted.

The district court noted Auger's objection, but stated that it disagreed. Auger filed this appeal.

## II. DISCUSSION

On appeal, Auger raises two arguments relating to the drug quantity. Specifically, Auger claims the district court erred in (1) including all of the seized plants as relevant conduct, and (2) finding the total drug weight was 866.4 kilograms of marijuana because the majority of the 8,664 plants were seedlings and there was no evidence the seedlings had any root formation.[5]

### A.    Relevant Conduct

Under the advisory guidelines, a defendant may be held accountable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  U.S.S.G. § 1B1.3(a)(1)(B).  To be held responsible for the conduct of others, the conduct must be both (1) "in furtherance of the jointly undertaken criminal activity" and (2) "reasonably foreseeable in connection with that criminal activity."  U.S.S.G. § 1B1.3 cmt. n.2; United States v. Hunter, 323 F.3d 1314, 1319-20 (11th Cir. 2003).  "In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to

---

[5]A district court must begin the sentencing process by correctly calculating the applicable guidelines range.  Gall v. United States, 552 U.S. 38, __, 128 S. Ct. 586, 596 (2007).  Likewise, this Court reviews a sentence in part by ensuring "that the district court committed no significant procedural error," such as improperly calculating the guidelines range.  Id. at __, 128 S. Ct. at 597.

13

jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement). The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct . . . ." U.S.S.G. § 1B1.3 cmt. n.2.[6]

Although its findings could have been clearer, the district court rejected as "inconceivable" Auger's claim that his jointly undertaken criminal activity was limited to only 100 to 150 marijuana plants and found that it encompassed the larger scale marijuana growing operation found on Auger's property. These undisputed facts support the district court's credibility finding: (1) Auger gave Hernandez and three other men free access to over a thousand acres of land; (2) Auger took the men to the property and showed them where they could plant the marijuana; (3) after that, Auger met with the men several times at his home to discuss the growing process; (4) Auger lived only four miles from the field where the marijuana was being grown and indeed only a quarter mile from the entrance to the property; (5) Auger negotiated a percentage of the yield; and (6) Auger initially denied to Agent Tinsley any knowledge of the marijuana plants and admitted his involvement only after being shown the site of the growing operation. In addition,

_____

[6]Although we review de novo whether the district court misapplied the relevant conduct provisions in U.S.S.G. § 1B1.3, United States v. McCrimmon, 362 F.3d 725, 728 (11th Cir. 2004), we review for clear error the district court's factual findings pertaining to relevant conduct, United States v. Blanc, 146 F.3d 847, 851 (11th Cir. 1998).

the following facts in PSI addendum, which the district court adopted, also cast doubt on Auger's claim: (1) Auger knew that four men were involved in the growing operation and that they were staying on the property to tend the plants; (2) Auger provided the men with a water pump, which they used to establish an elaborate irrigation system; and (3) Auger bought Hernandez a cell phone so they could communicate about the growing operation. The PSI addendum also explained that it was highly unlikely that Hernandez and his men would have grown significantly more marijuana than Auger authorized given that Auger's proximity to the growing site meant he might visit the site at any time.

These facts, which Auger did not dispute, support the district court's finding that the scope of the criminal activity Auger agreed to jointly undertake was not limited to 150 plants and that it was reasonably foreseeable to Auger that Hernandez and his men would conduct a large-scale marijuana growing operation. Thus, there is no reversible error in the district court's attributing to Auger all of the marijuana plants seized from his own property.

**B.    Total Weight Seized**

The question remains, however, whether the district court erred in its determination of the weight of the marijuana seized from Auger's land. We review our precedent in this regard and then what happened in this case.

15

1. <u>Marijuana Weight Precedent</u>

To calculate the offense level of a defendant convicted of an offense involving marijuana plants, each "plant" is treated as the equivalent of 100 grams of marijuana. U.S.S.G. § 2D1.1(c) E. "For purposes of the guidelines, a 'plant' is an organism having leaves and <u>a readily observable root formation (e.g., a marihuana cutting having roots, a rootball, or root hairs is a marihuana plant)</u>." U.S.S.G. § 2D1.1(c) cmt. n.17 (emphasis added). Our decision in <u>United States v. Foree</u>, 43 F.3d 1572, 1579-80 (11th Cir. 1995), sheds light on how marijuana plants are counted under the guidelines.

In <u>Foree</u>, this Court concluded that "for sentencing purposes, cuttings and seedlings are not 'marihuana plants' unless there is 'some readily observable evidence of root formation.'" 43 F.3d at 1574. A search of Foree's residence uncovered 24 mature marijuana plants, 56 cuttings and 17 seedlings. <u>Id.</u> at 1579. At sentencing, Foree argued that the cuttings and seedlings could not be counted as "plants" unless the government proved that they had readily observable root formations. <u>Id.</u> at 1580. The district court rejected this argument and included the cuttings and seedlings in the total drug quantity attributed to Foree for sentencing purposes. <u>Id.</u>

At the time of <u>Foree</u>, neither the drug statutes nor the Sentencing Guidelines

16

defined the term "plant." Id. Thus, this Court relied upon precedent from other circuits to conclude that "for sentencing purposes, root formation is the sine qua non of a marijuana 'plant.'" Id. We concluded:

> Marijuana plants have three characteristic components readily apparent to the unaided layperson's eye: roots, stems, and leaves. Until a cutting develops roots of its own, it is not a plant but a mere piece of some other plant. Accordingly, we hold that cuttings and seedlings are not "marihuana plants" within the meaning of 21 U.S.C. § 841(b) and U.S.S.G. § 2D1.1(c) unless there is some readily observable evidence of root formation.

Id. at 1581 (citations and quotation marks omitted). Because the district court had not made findings as to whether any of the cuttings and seedlings had roots, we vacated Foree's sentence and remanded for resentencing "to give the government the chance to make a proper showing if it can do so." Id. at 1582.

When Foree was decided, the Sentencing Commission already had proposed amending the commentary to U.S.S.G. § 2D1.1(c) to define a "plant" as an organism with leaves and "readily observable root formation" and to give as an example a marijuana "cutting" that has "roots, rootball or root hairs." 43 F.3d at 1580 n.12. After Foree, this proposed amendment was adopted. See U.S.S.G. app. C, amend. 518. Thus, for the seedlings here to be counted as marijuana plants for drug weight calculations, the government had to submit some evidence that the seedlings had root formations.

2. Auger's Case

Auger expressly objected several times to the factual statements in paragraph 6 of the PSI that local law enforcement seized from the growing site 8664 plants, 600 of which were seedlings. Auger's objections pointed out that the guidelines required readily observable root formation for seedlings to be counted as plants under § 2D1.1(c).

Once the defendant objects to a PSI's factual allegation, the government bears the burden to prove the disputed fact by a preponderance of the evidence. United States v. Rodriguez, 398 F.3d 1291, 1296 (11th Cir. 2005). If the government does not present sufficient evidence to support the disputed fact, we are "obliged to vacate the sentence imposed and remand for resentencing." United States v. Hall, 349 F.3d 1320, 1325-26 (11th Cir. 2003).

Given Auger's objections, the government was required to come forward with at least some evidence showing the number of "plants" seized, that is, the number of seized organisms with observable root formation. The government did call Agent Tinsley, but he never mentioned root formations. Specifically, Agent Tinsley testified that, when he inspected the plants, they were "in the nursery stage" in plastic containers, all of the plant matter fit in one to three trash bags, and he was able to hold thousands of them in the palm of his hand. Agent Tinsley also

18

testified that the majority of the plants were only seedlings. Agent Tinsley's testimony, if anything, contradicted the PSI's statements that only 600 of the 8,664 plants seized were seedlings and that the remainder were plants three to four feet high. Agent Tinsley testified summarily that both the Coffee County Sheriff's Office and the GBI counted the plants, but those reports are not in evidence.

In sum, the only evidence on this issue, at this juncture, is Agent Tinsley's testimony that the majority of the 8,664 plants were seedlings. And, there is no evidence indicating whether those seedlings had roots or root hairs. Thus, the record is insufficient to support the district court's finding of a drug weight of 866.4 kilograms.[7]

Accordingly, we remand for the district court to resolve the disputed factual issues as to: (1) the number of seized organisms that were seedlings, and (2) the number of seized organisms that had readily observable root formations and, thus, met the definition of a "plant" under § 2D1.1(c). Both parties shall be allowed to present evidence as to those issues on remand.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's finding that all of

---

[7]The government argues that any error was inconsequential because a plant count anywhere within Agent Tinsley's 1000-plant margin of error would have resulted in the same offense level. This argument ignores the fact that Agent Tinsley testified that "the majority" of the 8,664 plants were seedlings. Thus, any error was not harmless.

the seized marijuana plants should be counted as relevant conduct under § 1B1.3, but vacate Auger's sentence and remand for evidence and fact findings as to the number of seedlings seized and whether those seedlings constitute "plants" under § 2D1.1(c).[8]

**VACATED AND REMANDED.**

---

[8]Because our remand is for a limited, rather than a <u>de novo</u>, resentencing, the parties are precluded from raising at resentencing issues that could have been, but were not, raised in this appeal.