[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10998
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cr-20592-JAL-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SHARON ELIZABETH ANGULO,
a.k.a. Sharon Elizabeth Hayes-Angulo,
a.k.a. Sharon-Elizabeth : Angulo,
a.k.a. Sharon-E : Angulo,
a.k.a. Sharon : Angulo,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 11, 2016)

Before HULL, WILLIAM PRYOR and FAY, Circuit Judges.

PER CURIAM:

After pleading guilty, Sharon Elizabeth Angulo appeals her 60-month sentence for conspiracy to commit tax fraud, in violation of 18 U.S.C. § 371 and 26 U.S.C. § 7206(2).  Between August 2008 and September 2012, Defendant Angulo conspired with her co-defendant, Claudia Zuloaga, to file fraudulent and false tax returns and refund claims on behalf of clients of their tax preparation businesses. On appeal, Defendant Angulo argues that her sentence is procedurally unreasonable because the district court improperly included the intended losses from Defendant Angulo's own fraudulent tax filings in the loss amount calculated under U.S.S.G. § 2T4.1.  Defendant Angulo also contends that her 60-month sentence, within the advisory guidelines range of 57 to 60 months and at the statutory maximum, is substantively unreasonable.  After review, we affirm.

## I.  BACKGROUND FACTS

### A.    Defendant Angulo's Tax Fraud Conspiracy

The particular form of tax fraud Defendant Angulo and Zuloaga engaged in is called the "OID method" of tax fraud because it involves submitting false and fraudulent Internal Revenue Service ("IRS") Form 1099-Original Issue Document ("OID") and OID tax returns.  An IRS Form 1099-OID is used by financial institutions to report customers' interest income earned in connection with certain kinds of debt instruments, such as certificates of deposit and bonds.  A Form 1099-OID, similar to a Form W-2, is sent to both the IRS and to the taxpayer and reports

2

the interest income and any income taxes withheld from the interest income on behalf of the taxpayer.

Through the OID method of tax fraud, taxpayers falsely report on the OID tax returns that they received sizable interest income from financial institutions and, concurrently, that an equivalent amount of tax payments had been withheld by the financial institutions. As a result of these false OID returns, the taxpayers fraudulently claim that they are entitled to substantial tax refunds based on the overpayment of the fictitious withheld income taxes.

By early February 2009, Defendant Angulo and Zuloaga were engaged in the business of preparing and electronically filing fraudulent OID tax returns. To perpetrate the scheme, Angulo and Zuloaga instructed their clients to provide financial records, such as information about their mortgages, credit card debts, student loans, and equity lines, including balances and credit limits on each account, as well as checking, money market, savings and other bank account statements.

Angulo and Zuloaga then used that financial information to prepare fraudulent OID tax returns, listing their clients' various account balances or credit limits as Form 1099 interest and dividend "income" from financial institutions. In reality, the items listed represent money the clients had already spent or owed. Angulo and Zuloaga then caused the clients to report a corresponding amount as

federal income tax withheld by the financial institutions from their so-called interest income, thus fraudulently entitling them to large tax refunds.[1]

At the direction of Angulo and Zuloaga, one of their employees created fictitious Form 1099-OIDs using word processing templates that resembled the forms created by the financial institutions for reporting to the IRS. Angulo and Zuloaga also purposely omitted their names as tax preparers on the tax forms so that it would appear that the clients had prepared the returns themselves. They also instructed clients to tell the IRS that they had prepared their own returns. As payment for their tax preparation services, Angulo and Zuloaga took thirty percent of the refunds received by their clients.

Later investigation revealed Angulo and Zuloaga prepared and submitted 45 OID tax returns between February 2009 and November 2009. Together, the returns claimed $5,421,761 in fraudulent refunds on behalf of clients, and the IRS actually issued $1,679,056 in fraudulent refunds as a result of the scheme. Angulo and Zuloaga obtained a total of $461,939.71 from the refund payments from their clients.

---

[1]The OID scheme is based in part on taxpayers who contend the U.S. Treasury has secret accounts that they should be able to access for their personal debts and expenses. The OID method is premised upon an outlandish and completely fictional doctrine known as the "redemption doctrine," that falsely proposes that people with social security numbers can avoid personal debts, such as car and home loans, and be reimbursed for personal expenditures from secret "straw man" accounts maintained in each person's name by the U.S. Treasury. Under this theory, the person "redeems" the funds in his or her "straw man" account by submitting personal income tax returns to the Internal Revenue Service using the 1099-OID and OID tax return.

When IRS investigators began interviewing some of their clients, Angulo and Zuloaga interfered with the investigation in several ways, including: (1) giving their clients legally baseless questionnaires to give to IRS investigators and instructing the clients to refuse to speak to the investigators unless they answered the questionnaires; (2) continuing to file returns and to resubmit questioned returns with additional fraudulent documentation and fanciful legal arguments; (3) mailing packets of documents to the IRS stamped with legally irrelevant language, such as "accept for value . . . exempt from levy"; (4) returning IRS notices sent to Angulo and Zuloaga with the same legally irrelevant markings; and (5) making false statements to investigators.  When an IRS agent attempted to serve Defendant Angulo with a summons to obtain information about her tax preparation activities, Angulo identified herself as Leslie and claimed not to know the identity of Sharon Angulo.  At a subsequent judicial enforcement hearing, Defendant Angulo falsely stated to the court that she did not prepare anyone's taxes.

## B.    Defendant Angulo's Personal Tax Fraud

In addition to the scheme with Zuloaga outlined above, it is undisputed that Defendant Angulo also filed fraudulent OID tax returns and amended tax returns on her own behalf, although the IRS never paid her any of the requested tax refunds.

In particular, in October 2008, Defendant Angulo filed a 1040 form for the 2007 tax year falsely claiming a tax refund of $305,898. In May 2009, she filed an amended income tax return for the 2005 tax year falsely reporting federal income tax withholding of $837,834 and fraudulently claiming a tax refund of $533,889.

On the same day, Defendant Angulo also filed a fraudulent OID tax return and amended income tax return for the 2006 tax year that falsely reported a federal income tax withholding of $2,591,193 and fraudulent claimed a tax refund of $1,686, 201. In May 2010, she filed a fraudulent tax return for the 2008 tax year that falsely reported a federal income tax withholding of $837,013 and fraudulently claimed a tax refund of $479,057. In total, Angulo personally claimed $3,005,045 in fraudulent tax refunds.

As she had done for her clients, Defendant Angulo sent the IRS packets of documents, including fictitious 1099-A forms, fictitious "Private Bonds for Setoff" or "Private Offset Discharging and Indemnity Bond", and marked on some documents "Accepted for value exempt from levy." In July 2010, Angulo left a voicemail for an IRS agent stating that she had never prepared a tax return. Much of this conduct was charged in a count in Angulo's indictment, which the government dismissed pursuant to Angulo's plea deal.

C.    **Sentencing**

At sentencing, the district court, over Defendant Angulo's objection, included the $3,005,045 in intended losses from Angulo's own fraudulent tax filings in the total loss amount of $8,426,806. The district court determined that the loss amounts from Angulo's own fraudulent tax returns filed in 2008 and 2010 constituted relevant conduct because Angulo's own fraudulent tax returns were not "clearly unrelated" to the charged conspiracy and fell "under [U.S.S.G. §] 1B1.3, common scheme or plan or same course of conduct." The district court noted that Angulo used the same OID method in filing her own fraudulent tax returns that she used in the conspiracy with Zuloaga, resulting in "identical hallmark features of the type of fraudulent return" with "the same modus operandi and temporal proximity." Summing up, the district court stated that Angulo's own tax fraud "was exactly the same factual scenario, but it related to her return, rather than to the return of others."

As a result, Angulo's base offense level was 26 under U.S.S.G. § 2T4.1 because the total tax loss of $8,426,806 was more than $7,000,000 but not more than $20,000,000. See U.S.S.G. § 2T4.1(K)-(L) (2014). The district court applied a two level increase, under U.S.S.G. § 2T1.9(b)(2), for encouraging others to impede the collection of revenue in violation of internal revenue laws and a three-level reduction for accepting responsibility, for a total offense level of 25. With a criminal history category of I, Angulo's advisory guidelines range was 57 to 71

months' imprisonment, but became 57 to 60 months, pursuant to U.S.S.G. § 5G1.1(c)(1), due to the five-year statutory maximum under 18 U.S.C. § 371.

Angulo requested a downward variance to a 46-month sentence, arguing that: (1) after her arrest, she, unlike her Zuloaga, ceased the fraudulent activity; (2) since her arrest, she had tried to make amends by volunteering with a community program and cooperating with the government; and (3) she was a good mother to her six children and had strong community support. Angulo also personally addressed the district court, expressed regret for her conduct, saying she had made "a horrible mistake," discussed her volunteer work as a life coach, and asked for forgiveness and leniency.

The government conceded that Angulo "fell into a group of individuals who specifically engaged in th[is] type of behavior," and eventually repudiated her involvement with the group as a serious mistake. However, the government maintained that Angulo was not naïve about the benefits of the tax fraud scheme, and pointed out that Angulo did not immediately cease her fraudulent conduct after she became aware of its criminal nature or after she learned that her clients were being heavily sanctioned for their fraudulent returns. Rather, Angulo "continued on the path of this rather bizarre organization to which she associated herself" and obstructed the government's efforts to investigate. The government noted that South Florida was "the epicenter" for tax fraud activity, and argued that the

8

sentence needed to promote respect for the law and afford adequate deterrence of others.  The government requested a sentence within the advisory guidelines range.

The district court addressed the 18 U.S.C. § 3553(a) factors, focusing in particular upon the seriousness of the offense and the need for the sentence to deter others considering engaging in tax fraud.  The district court detailed the OID method's redemption theory, stating that "[i]f it wasn't so serious, one would think of it as fiction," and described Angulo and Zuloaga's scheme as "out-and-out fraud."  The district court noted that the fraudulent tax refunds were "not small," but "enormous," with intended losses of "[o]ver $5 million" and "the IRS pa[ying] over [$]1.6 million," of which Angulo and Zuloaga required their clients to pay them thirty percent, or $461,939.71.  The district court noted Angulo's six children, her low criminal history category, and the fact that, although she initially obstructed the fraud investigation, including identifying herself as someone else, "eventually she began to accept responsibility."

The district court described Angulo and Zuloaga as "the vehicle" for many others to participate in the scheme.  The district court observed that tax fraud is prevalent in Miami-Dade County and that Angulo's "offense contains refunds far larger than most of the fraudulent tax returns and refunds" the court sees on a daily basis.  The district court stressed the need for the sentence imposed to "speak loudly and clearly" so that others considering engaging in this type of offense

9

would know it is not tolerated.  The district court also noted that Zuloaga had received a 60-month sentence and that there was a need to avoid an unwarranted disparity between the two women's sentences.

In light of these considerations, the district court rejected Angulo's request for a downward variance and imposed a 60-month sentence.  Angulo objected to the district court's loss calculation and to the sentence itself as unreasonable.

## II.  PROCEDURAL REASONABLENESS

Although the Sentencing Guidelines are now advisory after United States v Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), the district court still must calculate the advisory guidelines range correctly.  United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008).  A sentence based on a miscalculated advisory guidelines range is procedurally unreasonable.  See Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007).

On appeal, Angulo contends that his sentence is procedurally unreasonable because the district court erred in determining her offense level.  The offense level for tax conspiracy offenses is calculated based on the tax-loss table in U.S.S.G. § 2T4.1.  U.S.S.G. §§ 2T1.1(a),  2T1.9(a)(1).  At the time of Angulo's sentencing, a tax loss of more than $7 million but less than $20 million resulted in a base offense level of 26.  See U.S.S.G. § 2T4.1(K).  A tax loss of more than $2.5 million but less than $7 million resulted in a base offense level of 24.  See id.

10

§ 2T4.1(J) (2014).[2]  The district court included $3,005,045 in intended losses from Angulo's own fraudulent tax returns filed in 2008 and 2010, for a total of $8,426,806 in tax losses, yielding an offense level of 26.

On appeal, Angulo argues that the $3,005,045 from her own fraudulent returns should not have been considered relevant conduct under U.S.S.G. § 1B1.3, and thus should not have been included in the total tax loss under U.S.S.G. § 2T4.1.[3]  We review the pertinent guideline provisions and then address Angulo's claim.

## A.    Relevant Conduct

Under U.S.S.G. § 1B1.3(a)(2), all of the defendant's acts and omissions that, if charged, would have been grouped together under U.S.S.G. § 3D1.2(d) and that "were part of the same course of conduct or common scheme or plan as the offense of conviction," are considered relevant conduct for purposes of determining the defendant's base offense level.  U.S.S.G. § 1B1.3(a)(2) & cmt. n.3.  Conduct may be part of a "common scheme or plan" if it is "substantially connected [to the offense conduct] by at least one common factor, such as common victims, common

---

[2]The Sentencing Commission recently amended the tax loss table in U.S.S.G. § 2T4.1 to adjust for inflation.  See U.S.S.G. app. C, amend. 791.  Effective November 1, 2015, a base offense level of 26 requires a tax loss of more than $9,500,000, and a base offense level of 24 requires a tax loss of more than $3,500,000 but less than $9,500,000.  U.S.S.G. § 2T4.1(J)-(K) (2015).

[3]We review the district court's calculation of the amount of tax loss for clear error. United States v. Patti, 337 F.3d 1317, 1323 (11th Cir. 2003).

accomplices, common purpose, or similar *modus operandi*." Id. cmt. n.9(A). Conduct that is not part of a common scheme or plan may instead be part of "the same course of conduct" if it is "sufficiently connected or related to [the offense conduct] as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." Id. cmt. n.9(B).

"[R]elevant conduct is broadly defined to include both uncharged and acquitted conduct that is proven at sentencing by a preponderance of the evidence." United States v. Siegelman, 786 F.3d 1322, 1332 (11th Cir. 2015). Furthermore, conduct outside the charged conspiracy may be included as relevant conduct if it is "sufficiently related to the conspiracy for which the defendant was convicted." United States v. Gomez, 164 F.3d 1354, 1357 (11th Cir. 1999). Offenses that are "discrete and unrelated," however, should not considered relevant conduct. United States v. Blanc, 146 F.3d 847, 854 (11th Cir. 1998). To determine whether extrinsic conduct qualifies as relevant conduct under U.S.S.G. § 1B1.3(a)(2), the court evaluates "the similarity, regularity and temporal proximity" between the extrinsic conduct and the offense conduct and "must consider whether there are distinctive similarities between the offense of conviction and the remote conduct that signal that they are part of a single course of conduct rather than isolated, unrelated events that happen only to be similar in kind." United States v. Maxwell, 34 F.3d 1006, 1011 (11th Cir. 1994) (quotation marks omitted).

**B.    Offense Levels Under U.S.S.G. § 2T4.1**

The Sentencing Guidelines define "tax loss" as "the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)."  U.S.S.G. § 2T1.1(c)(1).  To determine "the total tax loss attributable to the offense," an application note to § 2T1.1 cross-references U.S.S.G. § 1B1.3(a)(2), the relevant conduct provision, and directs that "all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated."  U.S.S.G. § 2T1.1 cmt. n.2.  For example, a defendant's tax offenses are considered part of the same course of conduct or part of a common scheme or plan if, inter alia, "there is a continuing pattern of violations of the tax laws by the defendant . . .[or] the violations involve the same or a related series of transactions."  Id. § 2T1.1 cmt. n.2(A), (C).

**C.    Angulo's Fraudulent Tax Filings**

The district court did not clearly err in considering Angulo's fraudulent personal tax filings as relevant conduct for sentencing purposes.  There was a clear pattern to all of Angulo's tax violations, and they easily could be viewed as part of a related series of transactions.  See U.S.S.G. § 2T1.1 cmt. n.2.  Angulo used the same "OID method" in preparing her own fraudulent returns that she used when preparing, or assisting in preparing, the returns of her clients with Zuloaga.  In both

13

cases, Angulo's intended victim was the IRS, and her purpose was to falsely claim tax refunds based on fraudulent information.  Moreover, Angulo filed her own fraudulent returns during the same time frame in which she and Zuloaga were preparing their clients' fraudulent returns.  When the IRS began to investigate, Angulo reacted similarly by attempting to skirt IRS agents' queries by submitting packets of documentation marked with phrases such as "accepted for value exempt from levy."

Although Angulo's personal tax fraud was charged in a separate (ultimately dismissed) count, it shared several common factors, including the same victim, purpose, and modus operandi, as well as close temporal proximity.  In short, as the district court stressed, Angulo's extrinsic conduct differed from her conspiracy conduct only in that Angulo was preparing returns for herself instead of a third party.  The undisputed facts do not show that Angulo's personal tax fraud was "clearly unrelated" to her tax fraud on behalf of her clients.  Because Angulo's own fraudulent tax returns can fairly be said to be part of the "same course of conduct or a common scheme or plan," the intended losses of $3,005,045 from her personal returns were properly included in the total tax loss amount used to determine her base offense level.

## II.  SUBSTANTIVE REASONABLENESS

In choosing the appropriate sentence, the district court must consider the 18 U.S.C. § 3553(a) factors, but need not address each factor separately on the record.[4] United States v. Scott, 426 F.3d 1324, 1329 (11th Cir. 2005). The weight to be given any § 3553(a) factor is committed to the sound discretion of the district court. United States v. Clay, 483 F.3d 739, 743 (11th Cir. 2007). Thus, a district court's failure to give mitigating factors the weight a defendant contends they deserve does not render the sentence unreasonable. United States v. Lebowitz, 676 F.3d 1000, 1016-17 (11th Cir. 2012).

"The party challenging the sentence bears the burden to show it is unreasonable in light of the record and the § 3553(a) factors." United States v. Tome, 611 F.3d 1371, 1378 (11th Cir. 2010). "[T]here is a range of reasonable sentences from which the district court may choose, and when the district court imposes a sentence within the advisory Guidelines range, we ordinarily expect that choice to be a reasonable one." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005). We will vacate a sentence only if "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing

---

[4]The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims. 18 U.S.C. § 3553(a).

15

the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." United States v. Irey, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc) (quotation marks omitted).

Angulo has not met her burden to show that her 60-month sentence is unreasonable. While the district court imposed the statutory maximum sentence, that sentence was within the applicable advisory guidelines range and is substantively reasonable in light of the § 3553(a) factors and the facts of the case. In choosing the sentence, the district court explicitly addressed the § 3553(a) factors and stressed in particular the seriousness of Angulo's offense, including the unusually large sums of money involved and Angulo's interference with the IRS's investigation. The district court also mentioned the need for Angulo's sentence to deter others from engaging in this type of tax fraud, given the prevalence of tax fraud in the Miami-Dade County area, and the need to avoid an unwarranted disparity with Zuloaga, who also received a 60-month sentence. The district court further noted, in mitigation, Angulo's low criminal history category, her six children, and the fact that, although Angulo initially obstructed the investigation, she eventually accepted responsibility for her actions.

Although Angulo argues that the district court failed to properly consider her good behavior after her 2012 arrest, the district court was not required to address explicitly every mitigation argument Angulo made. See Scott, 426 F.3d at 1329-

16

30; see also United States v. Amedeo, 487 F.3d 823, 833 (11th Cir. 2007) (explaining that a district court's failure to address a mitigating fact does not mean the district court failed to consider it in choosing the sentence).  Moreover, it was within the district court's discretion to give these mitigating facts less weight than the need for the chosen sentence to reflect the seriousness of Angulo's tax fraud scheme and to deter others from attempting such a scheme.  Angulo essentially asks this Court to reweigh the factors, which we do not do.  See Clay, 483 F.3d at 743.  We cannot say the district court's 60-month sentence was an abuse of discretion.

**AFFIRMED.**